# UNITED STATES DISTRICT COURT

Middle    DISTRICT OF   Tennessee

| | |
|---|---|
| UNITED STATES OF AMERICA<br>V.<br><br>ROBERT PORTER a/k/a Da Hero, a/k/a Pooh<br>et al.<br>(SEE LIST OF DEFENDANTS -ATTACHMENT 1)<br><br>(Name and Address of Defendant) | **CRIMINAL COMPLAINT**<br><br>Case Number: 10 - 2116 MK |

I, the undersigned complainant state that the following is true and correct to the best of my knowledge and belief. On or about ___June-December, 2010___ in ___Montgomery___ County, in the ___Middle___ District of ___Tennessee___ defendant(s) did,

*(Date)*

(Track Statutory Language of Offense)
knowingly and intentionally combine, conspire, confederate and agree with each other and with other persons known and unknown to knowingly and intentionally possess with intent to distribute controlled substances, including 500 grams or more of a mixture and substance containing cocaine, and 280 grams or more of a mixture and substance containing a detectable amount of cocaine base, that is crack cocaine, Schedule II controlled substances

in violation of Title ___21___ United States Code, Section(s) ___846 and Title 18 U.S.C. Section 2___ .

I further state that I am a(n) ___DEA TASK FORCE OFFICER___ and that this complaint is based on the following facts:

*Official Title*

    See attached Affidavit in Support of Criminal Complaint incorporated herein.

Continued on the attached sheet and made a part of this complaint: ☒ Yes   ☐ No

                             Signature of Complainant

                             JAMES R. WHITSETT
                             Printed Name of Complainant

Sworn to before me and signed in my presence,

___12/9/10___ at ___Nashville, Tennessee___

Date                      City                 State

| | | |
|---|---|---|
| E. CLIFTON KNOWLES | US MAGISTRATE JUDGE | |
| Name of Judge | Title of Judge | Signature of Judge |

**ATTACHMENT 1**
**LIST OF DEFENDANT - CRIMINAL COMPLAINT (Case Number_____ 10 - 2116 MK**

**CONSPIRACY TO DISTRIBUTE AND TO POSSESS WITH INTENT TO DISTRIBUTE CONTROLLED SUBSTANCES, INCLUDING 500 GRAMS OR MORE OF COCAINE and 280 GRAMS OR MORE OF CRACK COCAINE**

1. Robert PORTER a/k/a Da Hero a/k/a Pooh
2. Donnie PATTERSON a/k/a Big Donnie
3. Brian VANCE a/k/a Bird a/k/a Birdman a/k/a Da Bird
4. Dominique SIMONS a/k/a Disco
5. Joshua D. DIX a/k/a Grindhard
6. Shatika DIX
7. Travis HODGES a/k/a T-Bone
8. Gregory BROOKS
9. Deonis JELKS
10. Quinice CROSS
11. Lamont COTTON
12. Michael BROWN
13. Donald EWING a/k/a Dino
14. Demetrius DUNCAN a/k/a Whirley
15. Kronski HOWARD a/k/a Young Money a/k/a Units
16. Jerry DINKINS
17. Robert LIGON a/k/a Boosie
18. Dontrell PITTMAN a/k/a CT
19. Charles MOUNT a/k/a C-Red
20. Jonathan JOHNSON
21. Cornel OLIVER a/k/a Lil C
22. Alto PARNELL a/k/a Al-Pistol a/k/a A.P.
23. Xavier PARNELL a/k/a Chief
24. Anthony SHELTON a/k/a Petey a/k/a Slim
25. James FARLEY Jr. a/k/a Baby James
26. Dedric SHINE a/k/a Mook

<u>AFFIDAVIT IN SUPPORT OF CRIMINAL COMPLAINT</u>

I, James R. Whitsett being duly sworn, do hereby depose and state:

I am a Task Force Officer with the Drug Enforcement Administration (DEA), assigned to the Nashville District Office. I have been a Task Force Officer with DEA for the past 6 years. I have been a Law Enforcement Officer in the State of Tennessee for approximately 20 years. The majority of my Law Enforcement career has been spent as a Criminal Investigator. I have been assigned to various duties involving the investigation of the distribution of controlled substances and the laundering of drug related proceeds. I make this affidavit based upon personal knowledge derived from my participation in this investigation as well as information provided to me by other law enforcement officers.

I am also the affiant for the affidavit filed in support of the application for search warrants in case 10-2117 (4) which is contemporaneously being submitted to this Court ("the search affidavit.") That affidavit is incorporated by reference into this affidavit.

This affidavit seeks arrest warrants against the following people for conspiracy to distribute and to possess controlled substances with intent to distribute, including 500 grams or more of cocaine and 280 grams or more of cocaine

1

base ("crack cocaine") in violation of Title 21, United States Code, Section 846 and Title 18,

United States Code, Section 2.

1. **Robert PORTER a/k/a Da Hero a/k/a Pooh**
2. **Donnie PATTERSON a/k/a Big Donnie**
3. **Brian VANCE a/k/a Bird a/k/a Birdman a/k/a Da Bird**
4. **Dominique SIMONS a/k/a Disco**
5. **Joshua D. DIX a/k/a Grindhard**
6. **Shatika DIX**
7. **Travis HODGES a/k/a T-Bone**
8. **Gregory BROOKS**
9. **Deonis JELKS**
10. **Quinice CROSS**
11. **Lamont COTTON**
12. **Michael BROWN**
13. **Donald EWING a/k/a Dino**
14. **Demetrius DUNCAN a/k/a Whirley**
15. **Kronski HOWARD a/k/a Young Money a/k/a Units**
16. **Jerry DINKINS**
17. **Robert LIGON a/k/a Boosie**
18. **Dontrell PITTMAN a/k/a CT**
19. **Charles MOUNT a/k/a C-Red**
20. **Jonathan JOHNSON**
21. **Cornel OLIVER a/k/a Lil C**
22. **Alto PARNELL a/k/a Al-Pistol a/k/a A.P.**
23. **Xavier PARNELL a/k/a Chief**
24. **Anthony SHELTON a/k/a Petey a/k/a Slim**
25. **James FARLEY Jr. a/k/a Baby James**
26. **Dedric SHINE a/k/a Mook**

Each of the people for whom I seek arrest warrants have been intercepted multiple

times in the course of this federal wire tap investigation using telephones to carry out

their drug trafficking conspiracy. Some of those intercepted calls are summarized in this

affidavit and the incorporated search affidavit. The search affidavit contains call

summaries relating to defendants for whom both arrest and search warrants are requested

(i.e., **Robert PORTER, Donnie PATTERSON, Brian VANCE, Dominique SIMONS,**

**Joshua D. DIX, Shatika DIX, Travis HODGES, Gregory BROOKS, Deonis JELKS,**

2

Quinice CROSS, Lamont COTTON, Michael BROWN, Donald EWING, Demetrius DUNCAN, and Kronski HOWARD). Calls relating to defendants for whom only arrest warrants are requested are summarized in this arrest affidavit (i.e., **Jerry DINKINS, Robert LIGON, Dontrell PITTMAN, Charles MOUNT, Jonathan JOHNSON, Cornel OLIVER, Alto PARNELL, Xavier PARNELL, Anthony SHELTON, James FARLEY Jr., and Dedric SHINE**).

## SUMMARY

Based on court authorized interception of telephone calls and surveillance summarized in this and the incorporated search affidavit, this investigation determined that **Robert PORTER** is supplied kilogram amounts of cocaine by **Gregory BROOKS** and **Quinice CROSS**. **PORTER** then distributes the cocaine in Clarksville and Springfield, Tennessee, to various people including **Brian VANCE, Donnie PATTERSON, Kronski HOWARD, Lamont COTTON, Michael BROWN, Travis HODGES**, and **Quinice CROSS** (when **CROSS** was not the person supplying cocaine to **PORTER**) in Clarksville, Tennessee. **Brian VANCE** then distributes the cocaine, largely in the form of crack cocaine, to **Joshua D. DIX, Shatika DIX, Deonis JELKS, Jerry DINKINS, Robert LIGON, Dontrell PITTMAN, Charles MOUNT, Jonathan JOHNSON, Cornel OLIVER, Alto PARNELL, Xavier PARNELL, Dominique SIMONS, Anthony SHELTON, James FARLEY Jr., Dedric SHINE, Donald EWING, and Demetrius DUNCAN**.

During the course of the wire tap investigation, intercepted calls establish that **Brian VANCE** is a ranking member (5 Star Branch Elite or "5BE") of the Vice Lord street gang. **DINKINS, LIGON, MOUNT, EWING, OLIVER, ALTO PARNELL, XAVIER**

3

**PARNELL, SIMONS, SHELTON, and FARLEY, Jr**. are some of the other people involved in this conspiracy who have also been identified as Vice Lord street gang members. **SIMONS** is a 3 Star Universal Elite ("3UE"), a higher rank than **VANCE** who is a 5BE. **Brian VANCE** has been intercepted directing individuals within the Vice Lord gang and other subjects suspected of being gang members to commit cocaine, crack cocaine, and marijuana trafficking offenses, examples of which are shown later in this affidavit. Based on the intercepted conversations as well as drugs seized during arrests and/or searches, this conspiracy distributed and possessed with intent to distribute well over 280 grams of cocaine base (crack cocaine) and well over 500 grams of cocaine, which are both Schedule II controlled substances, between June 2010 and the present.

### Jerry DINKINS

During this investigation it was found that **Jerry DINKINS** is a crack cocaine trafficker operating in Clarksville, Tennessee. The investigation established that **DINKINS** sells crack cocaine for **Brian VANCE** and that **VANCE** supplied a cell phone to **DINKINS** for the purpose of trafficking crack cocaine to crack cocaine addicts.

On August 29, 2010 at 16:29:00, a call between **Brian VANCE** using **TARGET TELEPHONE 2** and **Jerry DINKINS** using phone 931-933-3149 was intercepted. During this call **DINKINS** asked **VANCE** if he (**VANCE**) wanted him to supply an unknown female with "that whole little package." Your Affiant believes that the "package" discussed in this conversation is a package of crack cocaine.

On September 3, 2010 a series of calls were intercepted between **Brian VANCE** using **TARGET TELEPHONE 2** and **Jerry DINKINS** using phone 931-933-3149. During these calls

4

**Brian VANCE** and **Jerry DINKINS** discuss **DINKINS** losing the battery for the phone (931-302-0464) that **VANCE** provided **DINKINS** to facilitate drug sales. One of these calls occurred on September 3, 2010 at 00:08:52. During this call **DINKINS** and **VANCE** discuss **DINKINS** purchasing a new phone and having the phone number placed on the new phone. During the conversation **VANCE** informed **DINKINS** that he (**DINKINS**) would be unable to put the phone number on the new phone without the code word and pass code. During the conversation **VANCE** stated that the code word was "Carlos Williams" with pass code "031105," which establishes that **VANCE** controlled this phone. During October of 2010, information was obtained from a Confidential Source (hereinafter referred to as "**CS 9**") concerning **Jerry DINKINS**. **CS 9** stated that he is a crack cocaine addict. **CS 9** stated that during 2010, he has purchased crack cocaine from **Jerry DINKINS** on multiple occasions. **CS 9** stated that **Jerry DINKINS** provided him with phone number 931-302-0464 to call when he (**CS 9**) wanted to purchase crack cocaine. **CS 9** stated that he would call 931-302-0464 and order crack cocaine and that **Jerry DINKINS** would then meet him and provide crack cocaine to him. **CS 9** stated that during the time he had been purchasing crack cocaine from **Jerry DINKINS**, he (**CS 9**) became aware that **Jerry DINKINS** sold crack cocaine for an individual known as "B." **CS 9** stated that he has observed "B" on one occasion and described "B" as a heavy set black male. Your Affiant believes that "B" is **Brian VANCE**. During the interception of **TARGET TELEPHONE 2**, the phone number 931-302-0464, provided by **CS 9**, has been identified as a phone used by **Jerry DINKINS** which is used as a contact number for crack cocaine addicts to contact when they wish to purchase crack cocaine. During the interception of **TARGET TELEPHONE 2**, phone number 931-302-0464 has also been identified as being a phone

5

provided to **Jerry DINKINS** by **Brian VANCE** for the purpose of trafficking crack cocaine.

On September 5, 2010 at 14:40:42, a call between **Brian VANCE** using **TARGET TELEPHONE 2** and **Jerry DINKINS** using phone 931-933-3149 was intercepted. During this call **Brian VANCE** instructs **DINKINS** and **Cornel OLIVER** a/k/a "Lil-C" to bring the "jug money" to him so he (**VANCE**) can "re-up." During the conversation **DINKINS** informs **Brian VANCE** that he (**DINKINS**) has 800. **VANCE** and **DINKINS** discuss the money and how much crack cocaine **DINKINS** had in his possession. During the conversation **DINKINS** stated that he had "four blister balls." Your Affiant is aware that the term "blister" is a term used by crack cocaine traffickers to describe crack cocaine that is of good quality. Your Affiant is also aware that the term "balls" is a term used by crack cocaine traffickers to describe one eighth of an ounce of crack cocaine. During this conversation **VANCE** asked **DINKINS** how much money **OLIVER** had. During the call **DINKINS** could be heard asking **OLIVER,** who apparently was standing nearby, how much money he had. **DINKINS** informed **VANCE** that **OLIVER** has not counted the money yet.

On September 7, 2010 at 13:19:37, a call between **Brian VANCE** using **TARGET TELEPHONE 2** and **Jerry DINKINS** using phone 931-302-0464 was intercepted. During this call **Brian VANCE** asked **DINKINS** "how much blister you got let?" Your Affiant is aware that the term "blister" is used by crack cocaine traffickers to describe crack cocaine that is of good quality. During the conversation **DINKINS** informed **Brian VANCE** that he (**DINKINS**) had "two or three balls in the house" and "a ball and a half or a little more on me." Your Affiant is aware that the term "balls" is a term used by crack cocaine traffickers to describe one eighth of an ounce of crack cocaine. Your Affiant believes that **DINKINS** informed **VANCE** that he

6

(**DINKINS**) had between 8.75 grams and 12.25 grams of crack cocaine in his possession during this conversation.

On September 8, 2010 at 15:21:46, a call between **Brian VANCE** using **TARGET TELEPHONE 2** and **Jerry DINKINS** using phone 931-933-3149 was intercepted. During this call **Brian VANCE** asked **Jerry DINKINS** to go to **Cornel OLIVER'S** a/k/a "Lil-C" house and get the "round blister" for him and to bring it to him on "the hill." During the conversation **VANCE** asked **DINKINS** if he had the key to **Cornel OLIVER'S** house to which **DINKINS** confirmed that he did. **VANCE** continued to describe the crack cocaine that he wants **DINKINS** to get, **VANCE** stated the "round cookie." Your Affiant is aware that crack cocaine traffickers often manufacture crack cocaine in round pots and that at the end of the cooking process the crack cocaine is formed into a round shape that is referred to as a "cookie." During the conversation **VANCE** stated "bring it to me on the hill." Your Affiant is aware through surveillance and other calls intercepted on **TARGET TELEPHONE 2** that when **VANCE** informs someone to come to "the hill", **VANCE** is referring to 997 East Happy Hollow Road, Clarksville, Tennessee. Your Affiant is also aware that **VANCE** uses this residence to manufacture crack cocaine.

### Criminal History of Jerry DINKINS

On October 1, 2009, **Jerry DINKINS** took a best interest plea, Judicial Diversion, in the Circuit Court of Montgomery County, Tennessee for sale and deliver of a schedule II controlled substance, class C felony. **Jerry DINKINS** received a sentence of three years to be served on probation.

According to arrest information obtained from the Montgomery County Sheriff's Office,

7

**Jerry DINKINS** was arrested on February and July of 2009, for sale of schedule II controlled substance in Montgomery County, Tennessee. The dispositions of these cases are unknown at the time of the writing of this affidavit.

### Robert LIGON a/k/a Boosie

During this investigation, **Robert LIGON a/k/a Boosie** has been identified as a crack cocaine trafficker operating in Clarksville, Tennessee. On August 10, 2010 at 22:31:06, **Brian VANCE** using **TARGET TELEPHONE 2** received an incoming call from **Robert LIGON** using phone 931-278-2988. During this call your Affiant believes that **Robert LIGON** asked **Brian VANCE** if he (**VANCE**) had any crack cocaine in the area of Summit Heights housing complex. During the conversation **Robert LIGON** stated "Ain't no blista over there in the hood?" to which **Brian VANCE** replied "They're hot at it." Your Affiant is aware that the term "blista" is used by crack cocaine traffickers to describe crack cocaine. Your Affiant believes that during this conversation **Brian VANCE** informed **Robert LIGON** that the police were in the area of the stash location and that he (**VANCE**) was unable to get to the crack cocaine at that time.

On August 11, 2010 at 14:06:13, **Brian VANCE** using **TARGET TELEPHONE 2** made an outgoing call to **Robert LIGON** using phone 931-278-2988. During this conversation your Affiant believes that **Brian VANCE** and **Robert LIGON** discussed crack cocaine and handguns that **Robert LIGON** had been arrested for earlier on August 11, 2010 by the Clarksville Police Department. Your Affiant believes **Brian VANCE** and **Robert LIGON** also discussed the possibility of a female claiming ownership of the guns in order for **Robert LIGON** to avoid possible federal charges. Your Affiant is aware that on August 11, 2010, the Clarksville

8

Police Department was in the area of the Riverside Apartments and that Officers detected the odor of marijuana coming from apartment E-36, Riverside Apartments. Officers knocked on the door of apartment E-36 and made contact with the apartment's occupants, Dominique Nall and **Robert LIGON**. Officers asked for and received consent to search the apartment from Dominique Nall. Dominique Nall advised officers that she lived at the apartment. During the search of the apartment, Officers located marijuana cigarettes "blunts", a small amount of marijuana, approximately 2.3 grams of crack cocaine, one Hi-Point 9mm pistol (loaded) and one Smith and Wesson 40 Cal. pistol (loaded). The guns were found in a dresser drawer along with about $2,000 in cash. **Robert LIGON** was advised of his rights and gave a verbal statement claiming ownership of the drugs and weapons. During the conversation **Brian VANCE** stated "You can't get ole' girl to take them gun charges?" to which **Robert LIGON** stated "Uh, uhm, I already took'm, well I aint just take'm but I did." During this portion of the conversation your Affiant believes that **Brian VANCE** is asking **Robert LIGON** if he **(LIGON)** could get Dominique Nall to claim ownership of the guns found during the search and that **Robert LIGON** advised **Brian VANCE** that he had already claimed ownership of the guns. During the conversation **Brian VANCE** stated "You know what that mean?", "Shit, its Fed, thats tough, you didn't know that", "Hell yeah, what uh uh a work, an an befo before, even if you wasn't a felon. A work and a pistol together is Federal." During this portion of the conversation your Affiant believes that **Brian VANCE** is informing **Robert LIGON** that he **(LIGON)** is facing possible Federal prosecution because he **(LIGON)** is a felon in the possession of crack cocaine and handgun. During the conversation **Brian VANCE** stated "Uh, the work and the pistol are felonies together, I mean, that's a Federal that's uh that's uh Federal already. And then, uh, uh. by

9

you being a felon, the Feds are going to pick it up regardless. So, shit you gonna have to get her to take them, or the Feds gonna come, no ands, buts about it, hell yeah." During this portion of the conversation your Affiant believes **Brian VANCE** continued to inform **Robert LIGON** that he (**LIGON**) needs to get Dominique Nall to claim ownership of the guns. Your Affiant is aware that on December 28, 2009, **Robert LIGON** was convicted of possession of cocaine for resale in Montgomery County Tennessee and that he received a sentence of six years of State probation.

On August 26, 2010 at 12:27:21, **Brian VANCE** using **TARGET TELEPHONE 2** received an incoming call from **Robert LIGON** using phone 931-278-2988. During this call your Affiant believes that **Robert LIGON** informed **Brian VANCE** that he (**LIGON**) wanted to get half an ounce of crack cocaine from **Brian VANCE**. Your Affiant believes that this call shows that **Robert LIGON** purchases crack cocaine from **Brian VANCE** on a regular basis. During the conversation **Robert LIGON** stated "I said let me start gettin up half of that whip again, get it all for ya, I need it anyway." Your Affiant believes that **Robert LIGON** is referring to purchasing a half ounce of crack cocaine during this portion of the conversation and that he (**LIGON**) had obtained that amount from **Brian VANCE** in the past. During this portion of the conversation **Robert LIGON** stated "I need it anyway." Your Affiant believes that this statement indicates that **Robert LIGON** needed this amount on a regular basis to fill his (**LIGON'S**) customers orders. During the conversation **Robert LIGON** stated "Uhm, what, you want me to hollar at Grind Hard?" to which **Brian VANCE** replied "Uh, let me come over there." Your Affiant believes that **Robert LIGON** asked **Brian VANCE** if he (**VANCE**)

10

wanted him (**LIGON**) to get the crack cocaine from **Joshua DIX** a/k/a Grind Hard and that **Brian VANCE** informed him (**LIGON**) that he (**VANCE**) would come and handle the sale.

On September 18, 2010 at 02:21:34, **Brian VANCE** using **TARGET TELEPHONE 2** received an incoming call from **Robert LIGON** using phone 931-278-2988. During this conversation your Affiant believes that **Robert LIGON** asked **Brian VANCE** if he (**VANCE**) was able to supply him (**LIGON**) with crack cocaine. During the conversation **Brian VANCE** stated "What you want?" to which **Robert LIGON** stated "Just a little something for right now. It's late. (u/i) eight ball." During this portion of the conversation your Affiant believes that **Robert LIGON** informed **Brian VANCE** that he (**LIGON**) needed an eighth of an ounce of crack cocaine. During the conversation **Brian VANCE** stated "Where you at?" to which **Robert LIGON** replied "Grind Hard's." Your Affiant believes that **Robert LIGON** is informing **Brian VANCE** that he (**LIGON**) was at the residence of **Joshua DIX** a/k/a Grind Hard at the time of this conversation. During the conversation **Brian VANCE** stated "Tell him to give you a ball." Your Affiant believes that during this portion of the conversation **Brian VANCE** informed **Robert LIGON** to tell **Joshua DIX** to give him (**LIGON**) an eighth of an ounce of crack cocaine.

On October 9, 2010 at 12:35:04, **Brian VANCE** using **TARGET TELEPHONE 2** received an incoming call from **Robert LIGON** using phone 931-278-2988. During this conversation your Affiant believes that **Robert LIGON** asked **Brian VANCE** if he (**VANCE**) had any crack cocaine in the Summit Heights housing complex. During the conversation **Robert LIGON** stated "What up you got some game over there" to which **Brian VANCE** stated "Yeah." Your Affiant believes that the reference to "game" during this portion of the

11

conversation is referring to crack cocaine. During the conversation **Robert LIGON** stated "who got it" to which **Brian VANCE** replied "Grind Hard." During this portion of the conversation your Affiant believes that **Brian VANCE** informed **Robert LIGON** that **Joshua DIX** a/k/a Grind Hard had the crack cocaine. During the conversation **Robert LIGON** stated "He say he ain't got no mo" to which **Brian VANCE** stated "Where Lil C at?" During this portion of the conversation your Affiant believes that **Robert LIGON** informed **Brian VANCE** that he (**LIGON**) had already contacted **Joshua DIX** a/k/a Grind Hard and that he (**LIGON**) was informed by **Joshua DIX** that he did not have any. Your Affiant believes that when **Brian VANCE** stated "Where Lil C at?" he (**VANCE**) was asking **Robert LIGON** if he had contacted **Cornel OLIVER** a/k/a Lil C. Your Affiant is aware that **Joshua DIX** and **Cornel OLIVER** both sell crack cocaine directly for **Brian VANCE** as shown in this affidavit and the search affidavit. During the conversation **Robert LIGON** stated "Ain't no telling, I'm fin to call him" to which **Brian VANCE** replied "Aight tell him I'm fin to go in the kitchen just go on and sell you something." During this portion of the conversation your Affiant believes that **Robert LIGON** informed **Brian VANCE** that he (**LIGON**) had not made contact with **Cornel OLIVER** a/k/a Lil C and that he (**LIGON**) was going to call him. Your Affiant also believes that **Brian VANCE** instructed **Robert LIGON** to tell **Cornel OLIVER** that he (**VANCE**) was going to manufacture more crack cocaine and to inform **Cornel OLIVER** to sell him (**LIGON**) an amount of crack cocaine.

Approximately two minutes after the above described call at 12:37:36, **Brian VANCE** using **TARGET TELEPHONE 2** made an outgoing call to **Robert LIGON** using phone 931-278-2988. During this call your Affiant believes that **Brian VANCE** informed **Robert LIGON**

12

that he (**VANCE**) was close to his (**LIGON'S**) location and would sell him the crack cocaine. During the conversation **Brian VANCE** stated "I got you I'm In the hood." Your Affiant believes that **Brian VANCE** is informing **Robert LIGON** that he (**VANCE**) will sell him the crack cocaine and that he is close to his location "hood." During the conversation **Robert LIGON** stated "alight I'm in the horseshoe where you at." Your Affiant is aware that the "horseshoe" is a street located in the Summit Heights housing complex.

### Robert LIGON's Criminal History

On October 15, 2009, **Robert LIGON** was convicted in the Criminal Court of Montgomery County, Tennessee for sale of a schedule II controlled substance, a class C felony. **Robert LIGON** was sentenced to six years to be served on State probation.

**Robert LIGON** is currently out on bond awaiting trial on three counts of sale and delivery of a schedule II controlled substance in Montgomery County, Tennessee.

### Dontrell PITTMAN, Charles MOUNT and Jonathan JOHNSON

On September 15, 2010, starting at 11:20:26, a series of calls were intercepted over **TARGET TELEPHONE 2** between **Brian VANCE and Dontrell PITTMAN a/k/a CT** using phone 931-237-9026. The intercepted calls indicated that **Dontrell PITTMAN** and others were coming to Clarksville, Tennessee to acquire crack cocaine from **Brian VANCE**. Surveillance units were put in place in an attempt to cover the deal and to also arrest **Dontrell PITTMAN** on outstanding Tennessee state arrest warrants. During one call that was intercepted on September 15, 2010 at 16:27:22, **Dontrell PITTMAN** was heard taking orders for others in the vehicle for crack cocaine. During the above conversation, **Dontrell PITTMAN** informs **Brian VANCE** that he (**PITTMAN**) and his associates are about to get off the exit and are close to arriving.

13

During the conversation, **Brian VANCE** asked **Dontrell PITTMAN** "what yall wanted for sure?" **Dontrell PITTMAN** can be heard asking his associates how much they wanted. **Dontrell PITTMAN** replied "Bro wants, Bro wants three, (talking in background: you want one? you want one? This aints Dino's bro its Bird. He wants to know how much work you wanna get. Bro wants one, and uh I want what I told you I want." Your Affiant believes that during this portion of the conversation **Dontrell PITTMAN** is informing **Brian VANCE** that one of his (**PITTMAN'S**) associates wants three and that the other wants one. During this portion of the conversation, **Dontrell PITTMAN** uses the term "work." Your Affiant is aware that the term "work" is used by crack cocaine traffickers to describe crack cocaine. During the above conversation, **Dontrell PITTMAN** stated "it aint been hot over there ain't it?", to which **Brian VANCE** stated "Shit that K-9 stay riding." Your Affiant believes that **Brian VANCE** is warning **Dontrell PITTMAN** that the police "K-9" will likely be in the area.

On September 15, 2010 at 17:23, surveillance units in Clarksville, Tennessee identified a white Cadillac bearing Tennessee tag 955-XPP registered to Charles Mount of 113 Swindell St., Sparta, Tennessee as the vehicle believed to be and later confirmed to be occupied by **Dontrell PITTMAN** parked at a residence located on Golf View Place, Clarksville, Tennessee. Clarksville surveillance units maintained surveillance of the vehicle. Intercepted calls from **TARGET TELEPHONE 2** indicated that **Brian VANCE** was on his way to meet with **Dontrell PITTMAN** and his associates. Intercepted calls over **TARGET TELEPHONE 2** indicated that **Brian VANCE** met with **Dontrell PITTMAN** and associates and the cocaine transaction was conducted. During one of these calls, **Brian VANCE** complained to **Dontrell PITTMAN** that the money was short. Surveillance later observed the vehicle leave the residence

14

and head toward Interstate 24. Surveillance units observed the vehicle get onto Interstate 24 and travel east toward Nashville. Officers of the Metro Nashville Police Department were positioned to intercept the vehicle in Nashville, Tennessee and to conduct a felony traffic stop of the vehicle. **Dontrell PITTMAN** is a violent offender and has been deemed armed and dangerous. Metro Nashville police officers conducted the stop and found **Dontrell PITTMAN**, **Charles MOUNT**, and **Jonathan JOHNSON** in the vehicle. **Dontrell PITTMAN** was arrested on the outstanding Tennessee arrest warrants. A search was made of the vehicle and of the person of **Dontrell PITTMAN**, **Charles MOUNT**, and **Jonathan JOHNSON.** During the search approximately 1 ounce of what is believed to be crack cocaine was found hidden between the butt cheeks of **Charles MOUNT**. During the search approximately three ounces of what is believed to be crack cocaine was found hidden between the butt cheeks of **Jonathan JOHNSON**. Both **Charles MOUNT** and **Jonathan JOHNSON** were arrested on state felony drug charges.

### Dontrel PITTMAN's Criminal History

On May 25, 2010, **Dontrel PITTMAN** was convicted in the Circuit Court of Montgomery County, Tennessee for facilitation of second degree murder, a Class B Felony. **Dontrel PITTMAN** was sentenced to twelve years in the Tennessee Department of Corrections.

On October 2, 2008, **Dontrel PITTMAN** was convicted in the Circuit Court of Montgomery County, Tennessee for Cocaine related charges, a Class B Felony. **Dontrel PITTMAN** was given an alternative sentence of eight years.

On October 2, 2008, **Dontrel PITTMAN** was convicted in the Circuit Court of Montgomery County, Tennessee for Reckless Endangerment involving a Deadly Weapon, a

Class E Felony and Evading Arrest, a Class E Felony.

## Charles MOUNT's Criminal History

**Charles MOUNT's** criminal history shows multiple arrest for felony drug offenses, and an arrest for coercion of a witness. He has also been sentenced to 5 years and 6 months for a felony probation violation in 2004. He is currently on probation for being a felon in possession of a firearm and for a felony drug offense.

## Jonathan JOHNSON's Criminal History

Jonathan **JOHNSON's** criminal history includes a four year sentence on May 18, 2005 for a felony cocaine conviction based on an arrest by the Tullahoma Police Department.

## Cornel OLIVER

During this investigation **Cornel OLIVER** has been identified as a cocaine and crack cocaine trafficker operating in Clarksville, Tennessee. During the investigation it was found that **Cornel OLIVER** deals cocaine and crack cocaine for **Brian VANCE**.

On August 11, 2010 at 13:27:06 **Brian VANCE** using **TARGET TELEPHONE 2** received an incoming call from **Cornel OLIVER** using phone 931-206-8958. During this conversation **Cornel OLIVER** asked **Brian VANCE** "When are you gonna leave some of that work with me?" Your Affiant is aware that the term "work" is used by crack cocaine traffickers to describe crack cocaine. During the conversation **Brian VANCE** replied "Just go grab it." Your Affiant believes that **Brian VANCE** is informing **Cornel OLIVER** to go to a person that holds crack cocaine for **Brian VANCE** and get some. During the conversation **Brian VANCE** stated "he be making my plays though. And he be doing it for free. I ain't trippin though you can go get some." Your Affiant believes that **Brian VANCE** informed **Cornel OLIVER** that the

16

person that he (**OLIVER**) is going to get the crack cocaine from works for **Brian VANCE** selling crack cocaine and that this person does it for free. During this portion of the conversation **Brian VANCE** stated "he be making my plays though." Your Affiant is aware that the term "play" is used by crack cocaine traffickers to describe selling someone crack cocaine. During the conversation **Cornel OLIVER** stated "Shit I was gonna hold I was gonna hold some, that's why I wanted to hold some of the shit. I can hold it and I, and I still can dime it out and pay you what I can pay you and I still make a lot overflow too." Your Affiant believes that during this portion of the conversation **Cornel OLIVER** informed **Brian VANCE** that he (**OLIVER**) was interested in holding and selling crack cocaine for **Brian VANCE** and that he would sell the crack cocaine and make a profit and then pay **Brian VANCE** what he (**OLIVER**) owed him. During the conversation **Brian VANCE** replied "Yeah, I'm gonna fuck with you." Your Affiant believes that **Brian VANCE** informed **Cornel OLIVER** that he (**VANCE**) was going to let **Cornel OLIVER** sell crack cocaine for him.

On August 18, 2010 at 13:07:09 **Brian VANCE** using **TARGET TELEPHONE 2** received an incoming call from **Cornel OLIVER** using phone 931-206-8958. During this conversation **Cornel OLIVER** stated "Shit where the work at?", to which **Brian VANCE** stated "Grind Hard." Your Affiant believes that during this conversation **Cornel OLIVER** informed **Brian VANCE** that he (**OLIVER**) needed crack cocaine and that **Brian VANCE** informed him (**OLIVER**) that a person by the name "Grind Hard" had the crack cocaine. Your Affiant is aware that "Grind Hard" is an alias for **Joshua DIX** who has been discussed earlier in this affidavit and in the search affidavit.

17

On August 27, 2010 at 18:24:22 **Brian VANCE** using **TARGET TELEPHONE 2** made an outgoing call to **Cornel OLIVER** using phone 931-206-8958. During this conversation **Brian VANCE** informed **Cornel OLIVER** to get an ounce of crack cocaine from a person by the name of Percy and **Brian VANCE** instructed **OLIVER** to add a cutting agent to an amount of cocaine and to deliver the cocaine to an unknown person. During this conversation **Brian VANCE** stated "Hey, tell Percy to give you that zip. I got one more zip." Your Affiant believes that **Brian VANCE** informed **Cornel OLIVER** to obtain an ounce of crack cocaine "zip" from Percy. During the conversation **Brian VANCE** stated "To give you the zip, cause Grind Hard be bullshitting." Your Affiant believes that **Brian VANCE** is informing **Cornel OLIVER** that **Joshua DIX** a/k/a Grind Hard is unable to deliver the crack cocaine and that he **(OLIVER)** needs to get it from "Percy." Your Affiant is aware that the term "zip" is used by crack cocaine traffickers to describe an ounce of crack cocaine. During the conversation **Brian VANCE** stated "Go down to Meecha's and get that gray can of Isotol. And put four grams in that soft. And I'm gonna get somebody to come get it." Your Affiant believes that **Brian VANCE** is instructing **Cornel OLIVER** to go to a female's residence by the name of "Meecha" and to retrieve a bottle of "isotol" and to add four grams of the "isotol" to an amount of powder cocaine that is in the possession of **Cornel OLIVER** and to have it ready for an unknown person to pick up. Your Affiant is aware that "isotol", (or inosital) is a dietary supplement that is commonly used by cocaine traffickers to add to cocaine to increase the weight of cocaine in order to make a higher profit.

On August 27, 2010 at 22:52:10, **Brian VANCE** using **TARGET TELEPHONE 2** received an incoming call from **Cornel OLIVER** using phone 931-206-8958. During this call

18

Cornel OLIVER informed Brian VANCE that he (OLIVER) had obtained an eighth of an ounce of crack cocaine from "Josh." During the conversation Cornel OLIVER stated "Hey umm, I just got another umm, basket from Josh." Your Affiant is aware that the term "basket" is used by crack cocaine traffickers to describe an eighth of an ounce of crack cocaine. Your Affiant believes that "Josh" referred to in this conversation is Joshua DIX a/k/a Grind Hard. During this conversation Cornel OLIVER also warns Brian VANCE that the police are in the area. Your Affiant has learned throughout this investigation that numerous subjects will call and inform Brian VANCE of police presence in and around the Summit Heights housing complex. During the conversation Brian VANCE stated "he said you got a blista ball earlier" to which Cornel OLIVER stated "Yeah, that was, that's what that extra hundred was for, that one ten." During this portion of the conversation your Affiant believes that Brian VANCE informed Cornel OLIVER that someone informed him (VANCE) that OLIVER had obtained an eighth of an ounce of crack cocaine and that OLIVER informed VANCE that he did and that was where the extra $110.00 came from.

On September 11, 2010 at 19:45:33, Brian VANCE using TARGET TELEPHONE 2 made an outgoing call to Cornel OLIVER using phone 931-206-8958. During this conversation your Affiant believes that Brian VANCE was inside the residence of Cornel OLIVER and that Brian VANCE was asking Cornel OLIVER where he (OLIVER) had hidden the crack cocaine. During the conversation Brian VANCE stated "where the work at" to which Cornel OLIVER replied "Shit in the closet." Your Affiant is aware that the term "work" is used by crack cocaine traffickers to describe crack cocaine. During the conversation Brian VANCE stated "What is it in?" to which Cornel OLIVER replied "that one box we had it in the first

19

time." Your Affiant believes that **Brian VANCE** is inside the residence of **Cornel OLIVER** at the time of this call and that **Cornel OLIVER** is directing **Brian VANCE** to the location where he **(OLIVER)** has hidden the crack cocaine. During the call **Brian VANCE** can be heard moving items around and your Affiant believes that he **(VANCE)** is looking for the "box" that contained the crack cocaine. During the conversation **Brian VANCE** stated "she must sold all of it." Your Affiant believes that this unknown female assisted **Cornel OLIVER** in selling crack cocaine. GPS data collected from **TARGET TELEPHONE 2** indicated that **Brian VANCE** was located in the Summit Heights housing complex at the time of this call. From calls intercepted during this investigation your Affiant believes that **Cornel OLIVER** lived at the Summit Heights housing complex during the time of this call.

On September 15, 2010 at 13:27:30, **Brian VANCE** using **TARGET TELEPHONE 2** made an outgoing call to **Cornel OLIVER** using phone 931-206-8958. During this call your Affiant believes that **Brian VANCE** is asking **Cornel OLIVER** how much crack cocaine he **(OLIVER)** has left and if he **(OLIVER)** needs to be supplied with crack cocaine. During the conversation **Brian VANCE** stated "How much work you got left" to which **Cornel OLIVER** replied "I aint for sure. I aint even all I ahh all I got is ahh I sold like five eight ball all by myself." Your Affiant believes that **Cornel OLIVER** informed **Brian VANCE** that he is not sure how much crack cocaine he has left but he **(OLIVER)** had sold five eight balls. Your Affiant is aware that an eight ball is one eighth of an ounce of crack cocaine. During the conversation **Cornel OLIVER** stated "How many you put in there how many you put in there? All I found was the five eight balls" to which **Brian VANCE** stated "ahh theres still a lot in there." Your Affiant believes that **Brian VANCE** informed **Cornel OLIVER** that he **(VANCE)**

20

put a lot more crack cocaine in the stash location than five eight balls. During the conversation **Cornel OLIVER** stated "Hold on let me see. Nah yeah yeah yeah yeah yeah four four four or five in there. I'm gonna go to town" to which **Brian VANCE** stated "You straight for the day you don't need nothin today." Your Affiant believes that **Cornel OLIVER** went to the stash location and found that there were four or five more eight balls. Your Affiant believes that when **Brian VANCE** stated "You straight for the day you don't need nothin today" he (**VANCE**) was asking **Cornel OLIVER** if he had enough crack cocaine to last him (**OLIVER**) for the day. During the conversation **Cornel OLIVER** stated "I said I got something for ya when I get to the hood." Your Affiant believes that **Cornel OLIVER** informed **Brian VANCE** that he (**OLIVER**) had cash for him that he (**OLIVER**) had made from the sale of crack cocaine.

On October 13, 2010 at 21:03:40, **Brian VANCE** using **TARGET TELEPHONE 2** made an outgoing call to **Cornel OLIVER** using phone 931-206-8958. During this conversation your Affiant believes that **Brian VANCE** is informing **Cornel OLIVER** that he (**VANCE**) is bringing him (**OLIVER**) ten eight balls of crack cocaine. During the conversation **Brian VANCE** stated "Hey be at, be at your house Im fixin to come over there." Your Affiant believes that **Brian VANCE** informed **Cornel OLIVER** that he (**VANCE**) was on the way to deliver crack cocaine to him. During the conversation **Cornel OLIVER** stated "Im on riverside by Arbys shit the front door open though." Your Affiant believes that during this portion of the conversation **Cornel OLIVER** is informing **Brian VANCE** that he (**OLIVER**) is not at his residence and also informed **Brian VANCE** that the front door to his (**OLIVER'S**) residence is open. During the conversation **Brian VANCE** stated "Shit alright there's ten of them." Your Affiant believes that **Brian VANCE** is informing **Cornel OLIVER** that he (**VANCE**) is

21

delivering ten eight balls of crack cocaine to his residence. Your Affiant is aware from calls intercepted between **Brian VANCE** and **Cornel OLIVER** that the crack cocaine sold by **Cornel OLIVER** is packaged in individual eighth of an ounce quantities. Your Affiant is also aware that an eighth of an ounce "eight ball" is a common amount sold by street level crack cocaine traffickers.

### Criminal History of Cornel OLIVER

On February 10, 2010, **Cornel OLIVER** was arrested in Montgomery County, Tennessee, for possession of cocaine for resale which is currently awaiting disposition. At the time of the writing of this affidavit, **Cornel OLIVER** is currently wanted on Tennessee State warrants for homicide and sale and delivery of a schedule 2 controlled substance.

### Alto PARNELL

During this investigation **Alto PARNELL** has been identified as a crack cocaine trafficker operating in Clarksville, Tennessee. On September 8, 2010 at 16:03:51, **Brian VANCE** using **TARGET TELEPHONE 2** received an incoming call from **Alto PARNELL** using phone 931-320-7837. **TARGET TELEPHONE 2** was answered by **Kronski HOWARD** and **Brian VANCE** could be heard in the background. During this conversation, **Alto PARNELL** asked "Who this?" to which **Kronski HOWARD** replied "Units." Your Affiant is aware that "Units" is one of the aliases used by **Kronski HOWARD**. During this conversation **Kronski HOWARD** informed **Alto PARNELL** that he and **Brian VANCE** were in the "kitchen." Your Affiant is aware that the term "kitchen" is used by crack cocaine traffickers to inform others that they are manufacturing or about to manufacture crack cocaine. During this conversation **Alto PARNELL** stated "Hey ask em if he got some blister." During this portion of

22

the conversation your Affiant believes that **Alto PARNELL** asked **Kronski HOWARD** to ask **Brian VANCE** if he **(VANCE)** had any crack cocaine. During this portion of the conversation **Kronski HOWARD** can be heard asking **Brian VANCE** if he **(VANCE)** had any "blister." **Kronski HOWARD** informed **Alto PARNELL** that he **(VANCE)** had a "ball", eighth of an ounce of crack cocaine. During the conversation **Alto PARNELL** stated "tell em put some with it make it look like four and half." During this portion of the conversation your Affiant believes that **Alto PARNELL** informed **Brian VANCE** through **Kronski HOWARD** to add some crack cocaine to the "ball",eighth of an ounce of crack cocaine, and make the package look like it contained four and a half grams of crack cocaine.

On September 13, 2010 at 13:22:53, **Brian VANCE** using **TARGET TELEPHONE 2** received an incoming call from **Alto PARNELL** using phone 931-320-7837. During this conversation, **Alto PARNELL** stated "You able to get some blister yet?" Your Affiant believes that **Alto PARNELL** is asking **Brian VANCE** if he has acquired any crack cocaine. Your Affiant is aware that the term "blister" is used by **Brian VANCE** to describe high quality crack cocaine. During the conversation, **Brian VANCE** informs **Alto PARNELL** that he is about to acquire some, to which **Alto PARNELL** replies "I said I'm in the hood, shit just hit me up." Your Affiant believes **Alto PARNELL** is informing **Brian VANCE** to contact him once he has acquired some "blister."

On September 15, 2010 at 17:09:19, **Brian VANCE** using **TARGET TELEPHONE 2** received an incoming call from **Alto PARNELL** using phone 931-320-7837. During this conversation, **Brian VANCE** stated "Ahh you tryin to get some work?" to which **Alto PARNELL** replied "Yeah one of them." Your Affiant believes that **Alto PARNELL** informed

23

**Brian VANCE** that he **(PARNELL)** wished to purchase one eighth of an ounce of crack cocaine. Your Affiant is aware that the term "work" is used by crack cocaine traffickers to describe crack cocaine. Your Affiant believes that the reference to "one of them" made by **Alto PARNELL** is referring to one eighth of an ounce of crack cocaine. Your Affiant is aware that this amount "eight ball" is a common amount sold by street level dealers.

On October 8, 2010 at 21:39:40, **Brian VANCE** using **TARGET TELEPHONE 2** received an incoming call from **Alto PARNELL** using phone 931-320-7837. During this call your Affiant believes that **Alto PARNELL** asked **Brian VANCE** if he **(VANCE)** had any crack cocaine and that he wanted one eighth of an ounce of crack cocaine. During the conversation **Alto PARNELL** stated "you still on deck?" to which **Brian VANCE** stated "yeah." Your Affiant believes that during this portion of the conversation **Alto PARNELL** asked **Brian VANCE** if he was available to sell him **(PARNELL)** crack cocaine. During the conversation **Alto PARNELL** stated "Shit, let me grab one right quick." Your Affiant believes that "one" referred to in this portion of the conversation is referring to one eight of an ounce of crack cocaine. Your Affiant is aware that this amount "eight ball" is a common amount sold by street level dealers.

On October 15, 2010 at 00:42:11, **Brian VANCE** using **TARGET TELEPHONE 2** received an incoming call from **Alto PARNELL** using phone 931-320-7837. During this call your Affiant believes that **Alto PARNELL** asked **Brian VANCE** if he **(VANCE)** had any crack cocaine. During the conversation **Alto PARNELL** stated "look though uh you still on deck" to which **Brian VANCE** stated "yeah i got one left." During this portion of the conversation your Affiant believes that **Brian VANCE** informed **Alto PARNELL** that he **(VANCE)** had one

24

package containing one eighth of an ounce of crack cocaine. During the conversation **Alto PARNELL** stated "let me grab let me grab one of them regular ones too." Your Affiant believes that during this portion of the conversation **Alto PARNELL** informed **Brian VANCE** that he wanted the one package of crack cocaine that contained one eighth of an ounce of crack cocaine and that he **(PARNELL)** also wanted one package of powder cocaine, "regular", containing one eighth of an ounce of cocaine.

On October 15, 2010 at 19:50:03, **Brian VANCE** using **TARGET TELEPHONE 2** received an incoming call from **Alto PARNELL** using phone 931-320-7837. During this call your Affiant believes that **Alto PARNELL** asked **Brian VANCE** if he **(VANCE)** could bring him **(PARNELL)** one eighth of an ounce of crack cocaine. During the conversation **Alto PARNELL** stated "Can you bring me one to the cut real quick?" Your Affiant believes that during this portion of the conversation **Alto PARNELL** informed **Brian VANCE** that he **(PARNELL)** wanted one eighth of an ounce of cocaine and that he **(PARNELL)** wanted **Brian VANCE** to bring it to him on Dyce Court in Clarksville, Tennessee. During this investigation your Affiant has become aware that Dyce Court is referred to as "the cut." During the conversation **Brian VANCE** stated "Shit, I got 10 balls on me bra." During this portion of the conversation your Affiant believes that **Brian VANCE** informed **Alto PARNELL** that he **(VANCE)** had one and a quarter ounces of crack cocaine on his person and that he **(VANCE)** could not come to **Alto PARNELL**'S location. Your Affiant is aware that the term "ball" is used by crack cocaine traffickers to describe one eighth of an ounce of crack cocaine. During the conversation **Alto PARNELL** stated "Alright I'm gonna try to come through there." Your Affiant believes that during this portion of the conversation **Alto PARNELL** informed **Brian**

25

**VANCE** that he **(PARNELL)** would come to **Brian VANCE**'S location to acquire the crack cocaine.

On October 15, 2010 at 23:14:07, **Brian VANCE** using **TARGET TELEPHONE 2** received an incoming call from **Alto PARNELL** using phone 931-320-7837. During this call your Affiant believes that **Alto PARNELL** informed **Brian VANCE** that he **(PARNELL)** needed a quarter ounce of crack cocaine. During the conversation **Alto PARNELL** stated "you still on deck?" to which **Brian VANCE** replied "Yeah." During this portion of the conversation your Affiant believes that **Brian VANCE** informed **Alto PARNELL** that he **(VANCE)** had crack cocaine available. During the conversation **Alto PARNELL** stated "Hey, save two of em for me. I'm fixing to come over there." During this portion of the conversation your Affiant believes that **Alto PARNELL** informed **Brian VANCE** that he **(PARNELL)** was coming to **Brian VANCE**'S location to acquire a quarter ounce of crack cocaine. During the call described above that took place on October 15, 2010 at 19:50:03, **Brian VANCE** informed **Alto PARNELL** that he **(VANCE)** had "10 balls on me." Your Affiant is aware that the term "ball" is used by crack cocaine traffickers to describe one eighth of an ounce of crack cocaine. During this conversation **Alto PARNELL** informed **Brian VANCE** that he **(PARNELL)** wanted "two of em" which your Affiant believes to be two "balls" totaling one quarter of an ounce of crack cocaine.

### Criminal History of Alto PARNELL

On July 18, 2005, **Alto PARNELL** was convicted in the Criminal Court of Montgomery County, Tennessee for sale of a schedule two controlled substance, a class B felony. **Alto PARNELL** was sentenced to six years to be served on community corrections.

26

On May 3, 2006, **Alto PARNELL** was convicted in the Criminal Court of Montgomery County, Tennessee for sale of a schedule two controlled substance, a class C felony. **Alto PARNELL** was sentenced to six years to be served on community corrections. **Alto PARNELL** is currently out on bond and awaiting trial in Montgomery County, Tennessee, for accessory after the fact for a homicide.

### Xavier PARNELL

During this investigation **Xavier PARNELL** a/k/a Chief has been identified as a crack cocaine trafficker operating in Clarksville, Tennessee. During the investigation it has also been found that **Xavier PARNELL** assists **Brian VANCE** in manufacturing crack cocaine by providing transportation to and from the cook house located at 997 East Happy Hollow Road, Clarksville, Tennessee.

On August 13, 2010 at 15:59:44, **Brian VANCE** using **TARGET TELEPHONE 2** received a call from **Xavier PARNELL** using phone 931-237-9314. During this conversation your Affiant believes that **Xavier PARNELL** is asking **Brian VANCE** if he (**VANCE**) has an ounce of crack cocaine, ("zip"), and an eighth of an ounce of crack cocaine, ("ball") in order for **Xavier PARNELL** to fill a customer's order. During the conversation **Xavier PARNELL** stated "You ain't got no, you ain't got no zip or nothing cause I got a little zip on the way down here, a zip and a ball" to which **Brian VANCE** replied "Uh, yeah, grind hard got it." Your Affiant believes that **Brian VANCE** informed **Xavier PARNELL** that he (**VANCE**) did have the crack cocaine and that it was in the possession of **Joshua DIX** a/k/a Grind Hard. On August 13, 2010 at 16:38:19 **Brian VANCE** using **TARGET TELEPHONE 2** received a follow up call from **Xavier PARNELL** using phone 931-237-9314. During this call your Affiant believes

27

that **Xavier PARNELL** informed **Brian VANCE** that he **(PARNELL)** contacted **Joshua DIX** a/k/a Grind Hard and that he **(DIX)** informed him that there was only an eighth of an ounce of crack cocaine left in his **(DIX)** possession. During the conversation **Brian VANCE** stated "Alright, shit I'm fixin to come out." Your Affiant believes that **Brian VANCE** is informing **Xavier PARNELL** that he **(VANCE)** will come out and fill the order. At 16:47:45 an additional follow up call between **Brian VANCE** using **TARGET TELEPHONE 2** and **Xavier PARNELL** using phone 931-237-9314 was intercepted. During this conversation your Affiant believes that **Brian VANCE** informed **Xavier PARNELL** that he **(VANCE)** was coming to **Xavier PARNELL**'S residence to fill the order. During the conversation **Brian VANCE** stated "Can you be at your crib in ten minutes so I can get that?" to which **Xavier PARNELL** stated "Hell, fuck yeah." Your Affiant believes that **Brian VANCE** informed **Xavier PARNELL** that he was going to be at **Xavier PARNELL**'S residence in ten minutes and that **Xavier PARNELL** informed **Brian VANCE** that he would be there.

On September 2, 2010 at 14:44:16, **Brian VANCE** using **TARGET TELEPHONE 2** received an incoming call from **Xavier PARNELL** using phone 931-237-9314. During this call your Affiant believes that **Brian VANCE** instructs **Xavier PARNELL** to come to the cook house located at 997 East Happy Hollow Road, Clarksville, Tennessee to pick up his **(VANCE'S)** car. Your Affiant believes **Brian VANCE** wants this done in order to keep others from knowing that he is at the residence. During the conversation **Brian VANCE** stated "Can you get a ride over here and get my car I'm in the kitchen" to which **Xavier PARNELL** replied "Where yo car at?" to which **Brian VANCE** replied "On the hill with me." Your Affiant believes that this conversation shows that **Xavier PARNELL** knows the location of the cook

28

house.

On October 04, 2010 at 16:09:30, **Brian VANCE** using **TARGET TELEPHONE 2** made an outgoing call to **Xavier PARNELL** using phone 931-237-9314. During this call your Affiant believes that **Brian VANCE** asked **Xavier PARNELL** if he (PARNELL) needed any crack cocaine. During the conversation **Brian VANCE** stated "You need some work today?" to which **Xavier PARNELL** replied "Hell na tomorrow. I got like that last little thirty." Your Affiant believes that **Xavier PARNELL** informed **Brian VANCE** that he (PARNELL) did not need any crack cocaine today and that he (PARNELL) still had thirty grams of crack cocaine left and that he (PARNELL) will need to be supplied with additional crack cocaine on October 5, 2010.

On October 17, 2010 at 14:29:36, **Brian VANCE** using **TARGET TELEPHONE 2** received an incoming call from **Xavier PARNELL** using phone 931-237-9314. During this call your Affiant believes that **Xavier PARNELL** informed **Brian VANCE** that he (PARNELL) had missed a $100.00 dollar crack cocaine sale and that he (PARNELL) needed to be supplied with crack cocaine. During the conversation **Xavier PARNELL** stated "What up Bro? nah I was calling ya I had a hundred sale" to which **Brian VANCE** replied "Yeah, I only did ya one right but it did like 33." Your Affiant believes that **Brian VANCE** informed **Xavier PARNELL** that he (VANCE) manufactured crack cocaine for **Xavier PARNELL** and that he (VANCE) cooked an ounce of cocaine and that it yielded 33 grams of crack cocaine from the manufacturing process. Your Affiant is aware that during the crack cocaine manufacturing process that good quality cocaine and the skill of the manufacturer determines the amount of crack cocaine that can be produced from a given amount of cocaine.

29

## Criminal History of Xavier PARNELL

On February 22, 2007, **Xavier PARNELL** was convicted in the Criminal Court of Montgomery County, Tennessee for sale of a schedule two controlled substance, a class B felony. **Xavier PARNELL** was sentenced to eight years to be served on probation.

On April 13, 2007, **Xavier PARNELL** was convicted in the Criminal Court of Montgomery County, Tennessee for sale of a schedule six controlled substance, a class E felony. **Xavier PARNELL** was sentenced to eighteen months to be served on probation.

## Anthony SHELTON

During this investigation **Anthony SHELTON** has been identified as a crack cocaine trafficker operating in Clarksville, Tennessee. On September 11, 2010 at 17:06:24, **Brian VANCE** using **TARGET TELEPHONE 2** received an incoming call from **Anthony SHELTON** using phone 931-320-5850. Your Affiant believes that during this conversation **Anthony SHELTON** informed **Brian VANCE** that he **(SHELTON)** was going to get an eighth of an ounce of crack cocaine. During this conversation, **Anthony SHELTON** stated "Aight, you the blister down there though" to which **Brian VANCE** replied "Yeah I ain't got nothin but two balls left." Your Affiant believes that during this portion of the conversation **Anthony SHELTON** asked **Brian VANCE** if he had crack cocaine at a location and that **Brian VANCE** told **Anthony SHELTON** that he **(VANCE)** only had two "balls" left. During the conversation **Anthony SHELTON** stated "Aight I'm have to get one of them though." Your Affiant believes that during this portion of the conversation **Anthony SHELTON** informed **Brian VANCE** that he **(SHELTON)** was going to get one eighth of an ounce of crack cocaine from the location.

30

On September 12, 2010 at 01:15:56, **Brian VANCE** using **TARGET TELEPHONE 2** received an incoming call from **Anthony SHELTON** using phone 931-320-5850. Your Affiant believes that during this conversation **Anthony SHELTON** asked **Brian VANCE** if he (VANCE) had any more crack cocaine and that he (SHELTON) was going to get an eighth of an ounce of crack cocaine from **Brian VANCE**. During the conversation **Anthony SHELTON** stated "Man I aint Man ain't any more blister balls?" to which **Brian VANCE** replied "I got one on me." During this portion of the conversation your Affiant believes that **Brian VANCE** informed **Anthony SHELTON** that he (VANCE) had an eighth of an ounce of crack cocaine on his (VANCE'S) person. During the conversation **Anthony SHELTON** stated "Mann, um let me get I'm in the one way" to which **Brian VANCE** replied "I'm goin pull up." During this portion of the conversation your Affiant believes that **Anthony SHELTON** informed **Brian VANCE** that he (SHELTON) wanted the eighth of an ounce of crack cocaine and that he (SHELTON) was in the Summit Heights housing complex and that **Brian VANCE** agreed to meet **Anthony SHELTON** and supply the crack cocaine. Your Affiant is aware that the "one way" is a street located in the Summit Heights housing complex in Clarksville, Tennessee.

On September 14, 2010 at 20:34:21, **Brian VANCE** using **TARGET TELEPHONE 3** received an incoming call from **Anthony SHELTON** using phone 931-320-5850. During this conversation, **Anthony SHELTON** stated "When you comin out?" to which **Brian VANCE** replied "Shit I aint even got tatted yet." During this portion of the conversation your Affiant believes that **Anthony SHELTON** asked **Brian VANCE** when he (VANCE) was going to be available and that **Brian VANCE** informed **Anthony SHELTON** that he (VANCE) was about to get a tattoo and that he was unavailable. During the conversation **Anthony Shelton** stated

31

"Man Im tryin to get that Blister Ball." Your Affiant is aware that the term "blister" is used by crack cocaine traffickers to describe crack cocaine that is of good quality. Your Affiant is also aware that the term "ball" is used by crack cocaine traffickers to describe an eighth of an ounce of crack cocaine. During the conversation **Anthony SHELTON** stated "Hay Tweeter said he will give it to me if you give it back to him" to which **Brian VANCE** replied "Alright." Your Affiant believes that during this portion of the conversation **Anthony SHELTON** informed **Brian VANCE** that an unknown subject by the name "Tweeter" agreed to supply the crack cocaine to **Anthony SHELTON** if **Brian VANCE** would agree to give the crack cocaine back to "Tweeter" and that **Brian VANCE** agreed to this arrangement. Your affiant believes that **SHELTON** was attempting to obtain crack cocaine from **VANCE**, but **VANCE** was unable to meet with **SHELTON** at that time, and that **VANCE** agreed to provide crack cocaine to "Tweeter" in return for Tweeter providing crack cocaine to **SHELTON.**

On September 15, 2010 at 20:38:01, **Brian VANCE** using **TARGET TELEPHONE 2** received an incoming call from **Anthony SHELTON** using phone 931-320-5850. Your Affiant believes that during this conversation **Anthony SHELTON** informed **Brian VANCE** that he **(SHELTON)** wanted to get a half ounce of crack cocaine. During the conversation **Anthony SHELTON** stated "Im gonna get two whip balls and two uh two blista balls" to which **Brian VANCE** stated "Alright." Your Affiant believes that during this portion of the conversation **Anthony SHELTON** informed **Brian VANCE** that he **(SHELTON)** was going to get one quarter of an ounce of "whip" crack cocaine and one quarter of an ounce of "blista" crack cocaine, totaling one half ounce. Your Affiant is aware that **Brian VANCE** manufactures two

32

types of crack cocaine that is of different quality, "whip" is a lesser quality crack cocaine and "blista" is a higher quality of crack cocaine.

On September 22, 2010 at 12:53:09, **Brian VANCE** using **TARGET TELEPHONE 3** made an outgoing call to **Anthony SHELTON** using phone 931-320-5850. During this conversation, your Affiant believes that **Brian VANCE** and **Anthony SHELTON** are discussing a sale of crack cocaine that **Brian VANCE** wants "Skip" to make to an unknown person operating a van. During the conversation, **Brian VANCE** stated "Tell skip come around and get this sale in the van." Your Affiant knows that the term "sale" is a term used by crack cocaine trafficker to describe selling controlled substance to an individual. During the conversation, **Anthony SHELTON** is heard relaying the information to a subject believed to be "Skip." During the conversation, **Brian VANCE** stated "In a van and a small pack." Your Affiant believes that when **Brian VANCE** stated "small pack" he is referring to a predetermined amount of crack cocaine. During this conversation **Brian VANCE** and **Anthony SHELTON** make reference to **"James"** who your Affiant believes to be **James FARLEY, Jr.** Your Affiant bases this belief on intercepted calls intercepted on **TARGET TELEPHONE 2** and from an ongoing homicide investigation. During the conversation **Anthony SHELTON** stated "What they do with James?" to which **Brian VANCE** replied "Uhhh, he aaaa he locked up, I'm going to the lawyer now." During this portion of the conversation your Affiant believes that **Anthony SHELTON** asked **Brian VANCE** what was the status of **James FARLEY, Jr.** and that **Brian VANCE** informed **Anthony SHELTON** that **James FARLEY, Jr.** was in jail. On September 21, 2010, **James FARLEY, Jr.** was arrested for an incident in which he shot and killed one person and wounded another person after they apparently tried to rob **FARLEY, Jr.** of drugs.

33

Intercepted calls indicate that **VANCE** supplied **FARLEY, Jr.** with those drugs. These calls are further described in this affidavit in the **James FARLEY, Jr.** section.

On October 1, 2010 at 20:33:19, **Brian VANCE** using **TARGET TELEPHONE 2** made an outgoing call to **Anthony SHELTON** using phone 931-320-5850. During this call your Affiant believes that **Anthony SHELTON** informed **Brian VANCE** that he **(SHELTON)** wanted **Brian VANCE** to supply him **(SHELTON)** with a eighth of an ounce of "blista" crack cocaine and a eighth of an ounce of "whip" crack cocaine. During the conversation **Brian VANCE** stated "What you tryin' to do?" to which **Anthony SHELTON** replied "Shit, I'm tryin' to get a basket of that blista and a basket of whip." Your Affiant is aware that a "basket" is a term used by crack cocaine trafficker to describe an eighth of an ounce of crack cocaine. Your Affiant is also aware that "blista" is crack cocaine that is of high quality and that "whip" is crack cocaine of a lesser quality.

On October 11, 2010 at 18:39:54, **Brian VANCE** using **TARGET TELEPHONE 2** made an outgoing call to **Anthony SHELTON** using phone 931-320-5850. During this call your Affiant believes that **Anthony SHELTON** informed **Brian VANCE** that he **(SHELTON)** had acquired an eight of an ounce of crack cocaine from an unknown male by the name "Tweezy." During the conversation **Brian VANCE** stated "I thought you needed some work" to which **Anthony SHELTON** replied "Tweezy got me a blista ball." Your Affiant is aware that the term "blista" is used by crack cocaine traffickers to describe crack cocaine and that "ball" is used to describe an eighth of an ounce of crack cocaine.

### Criminal History of Anthony SHELTON

On April 24, 2008, June 4, 2008, and October 14, 2009, **Anthony SHELTON** was

34

convicted in the General Sessions Court of Montgomery County, Tennessee for simple possession of a controlled substance. **Anthony SHELTON** is currently out on bond and awaiting trial in Montgomery County, Tennessee, for sale and delivery of a schedule II controlled substance, possession of schedule II controlled substance, and possession of a firearm in the commission of a dangerous felony.

### James FARLEY Jr.

During this investigation **James FARLEY Jr. a/k/a Baby James** has been identified as a cocaine and crack cocaine trafficker operating in Clarksville, Tennessee. On September 3, 2010 at 22:38:18, **Brian VANCE** using **TARGET TELEPHONE 2** received an incoming call from **James FARLEY Jr.** using phone 931-472-6113. During this conversation your Affiant believes that **James FARLEY Jr.** informed **Brian VANCE** that he **(FARLEY)** wanted to obtain an eighth of an ounce of crack cocaine. During the conversation **James FARLEY Jr.** stated "I'm tryin to get a ball." Your Affiant is aware that a "ball" is a term used by crack cocaine traffickers to describe an eighth of an ounce of crack cocaine.

On September 5, 2010 at 15:06:27, **Brian VANCE** using **TARGET TELEPHONE 2** received an incoming call from **James FARLEY Jr.** using phone 931-472-6113. During this conversation your Affiant believes that **James FARLEY Jr.** asked **Brian VANCE** if he **(VANCE)** was going to have crack cocaine available on September 5, 2010. During the conversation **James FARLEY Jr.** stated "You whippin up some blista today?" Your Affiant is aware that the term "blista" is used by crack cocaine traffickers to describe crack cocaine. During the conversation **Brian VANCE** stated "You already got the money", "How much you got?" to which **James FARLEY Jr.** replied "I got shit 300 on my now." Your Affiant believes that

James FARLEY Jr. informed **Brian VANCE** that he **(FARLEY)** had $300.00 to spend on crack cocaine. Your Affiant is aware that the street value of a quarter of an ounce of crack cocaine is approximately $300.00.

On September 13, 2010 at 14:23:31, **Brian VANCE** using **TARGET TELEPHONE 2** received an incoming call from **James FARLEY Jr.** using phone 931-472-6113. During this conversation your Affiant believes that **James FARLEY Jr.** informed **Brian VANCE** that he **(FARLEY)** wanted an eighth of an ounce of crack cocaine. During the conversation **James FARLEY Jr.** stated "I just need to get a ball" to which **Brian VANCE** replied "shit, I be there in a minute." Your Affiant is aware that the term "ball" is used by crack cocaine traffickers to describe and eighth of an ounce of crack cocaine. During the conversation **Brian VANCE** stated "Who you got to a ball?" to which **James FARLEY Jr.** replied "shit I got a 150 sale, I be busting ass." Your Affiant believes that **Brian VANCE** asked **James FARLEY Jr.** who he **(FARLEY)** was going to sell an eighth of an ounce of crack cocaine to and that **James FARLEY Jr.** informed **Brian VANCE** that he **(FARLEY)** had an unknown person that he was going to sell the crack cocaine to for $150.00. Your Affiant is aware that the street value of one eighth of ounce crack cocaine is approximately $150.00.

On September 21, 2010 at 13:25:28, **Brian VANCE** using **TARGET TELEPHONE 2** made an outgoing call to **James FARLEY Jr.** using phone 931-472-6113. During this conversation your Affiant believes that **James FARLEY Jr.** informed **Brian VANCE** that he **(FARLEY)** wanted to be supplied with three quarters of an ounce of crack cocaine and one eighth ounce of powder cocaine. During the conversation **James FARLEY Jr.** stated "Hey can I get uhhh three quarters and aaaa, like a ball a ball of powder." Your Affiant believes that the

36

reference made in this portion of the conversation to "three quarters" is three quarters of an ounce of crack cocaine. Your Affiant believes that the reference made in this portion of the conversation to "ball of powder" is one eighth of an ounce of powder cocaine. During the conversation **Brian VANCE** stated "Who want that?" to which **James FARLEY Jr.** replied "Huh, My white boy." During this portion of the conversation your Affiant believes that **James FARLEY Jr.** informed **Brian VANCE** that he **(FARLEY)** was going to sell the crack cocaine and the powder cocaine to a white male. During the conversation **James FARLEY Jr.** stated "My white boy want three, three quarters and a bag of powder and shit I was fin to charge him like 1750.00 for all of it." Your Affiant believes that **James FARLEY Jr.** informed **Brian VANCE** that he **(FARLEY)** was going to sell the cocaine to the white male for $1,750.00. Your Affiant believes that **James FARLEY Jr.** obtained the crack cocaine and cocaine from **Brian VANCE** and that later **James FARLEY Jr.** delivered the crack cocaine and cocaine to the "white boy." Your Affiant believes that the delivery led to an incident where one man was killed and another man was wounded after the buyer "white boy" attempted to rob **James FARLEY Jr.** of the cocaine at gun point and **James FARLEY Jr.** pulled his own weapon and shot and killed one man and wounded the other. Your Affiant bases this belief on calls intercepted on **TARGET TELEPHONE 2** between **Brian VANCE** and **James FARLEY Jr.** as described below.

On September 21, 2010 at 15:29:28, **Brian VANCE** using **TARGET TELEPHONE 2** received an incoming call from **Bermisha VANCE** using phone 931-931-378-9961. During this call **Bermisha VANCE** gives the phone to **James FARLEY Jr.** so that he **(FARLEY)** can speak with **Brian VANCE**. During this conversation **James FARLEY Jr.** informed **Brian**

VANCE that he **(FARLEY)** had just been involved in a shooting and that one man was dead and another was wounded. During the conversation **James FARLEY Jr.** stated that the men he shot were trying to rob him of drugs and money. During the conversation **James FARLEY Jr.** stated "Man, hey they tried to jack me man, took all my money and took the dope" to which **Brian VANCE** replied "Who did?" During this portion of the conversation your Affiant believes that **James FARLEY Jr.** informed **Brian VANCE** that the men he **(FARLEY)** was meeting to sell crack cocaine and cocaine to tried to rob him of the crack cocaine, cocaine, and money. During the conversation **James FARLEY Jr.** stated "Man the dude I was gonna go deal with, they took my money my dope, I got the dope back, I got your dope back but shit, I didn't get my money back." During this portion of the conversation your Affiant believes that **James FARLEY Jr.** informed **Brian VANCE** that the men that robbed him were the men that **James FARLEY Jr.** had spoken to **Brian VANCE** about earlier on September 21, 2010 at 13:25:28 as described above. During this portion of the conversation your Affiant believes that **James FARLEY Jr.** informed **Brian VANCE** that he **(FARLEY)** had been able to retrieve **Brian VANCE'S** crack cocaine and cocaine but was unable to retrieve his **(FARLEY'S)** money. During the conversation **Brian VANCE** stated "Who was it?" to which **James FARLEY Jr.** replied "Man these two smokers, these two smokers, I been fucking with about two weeks." During this portion of the conversation your Affiant believes that **James FARLEY Jr.** informed **Brian VANCE** that the men that tried to rob him were two crack cocaine addicts that he **(FARLEY)** had been selling crack cocaine to for approximately two weeks. During the conversation **Brian VANCE** stated "How'd you get the dope back?" to which **James FARLEY Jr.** replied "Huh, I sh - I shot, I killed one of em." During this portion of the conversation your Affiant believes that

38

James FARLEY Jr. informed **Brian VANCE** that he shot and killed one of the men. **James FARLEY Jr.** went on to say "Shit he raised up, (stutters) why he, while he fell out I was going through his pockets and shit and I got your dope back and shit", "Shit, I was right there by Port, Palmor, Port Royal. I shot, I shot both em, I got both em, I shot both of em, one of em dead." During this portion of the conversation your Affiant believes that **James FARLEY Jr.** informed **Brian VANCE** how he **(FARLEY)** retrieved **Brian VANCE'S** crack cocaine and cocaine and where the incident took place and that he **(FARLEY)** shot both of the men and that one man was dead. Your Affiant is aware from the investigation into the shooting that the shooting occurred in Stewart County, Tennessee near the town of Palmyra. During the conversation **Brian VANCE** stated "Where the other one go?" to which **James FARLEY Jr.** replied "shit he walking down the street, he had my phone, I said give me my goddamn phone back man before I bust your motherfucking ass, He said man take your phone just don't kill me man, he said just take phone and leave. Hell yeah he took my phone, my motorcycle keys." During this portion of the conversation your Affiant believes that **James FARLEY Jr.** informed **Brian VANCE** that the wounded man had walked to a street and that he **(FARLEY)** had confronted the man there and retrieved his **(FARLEY'S)** cell phone. During the conversation **Brian VANCE** stated "What he try to do rob with a gun?" to which **James FARLEY Jr.** replied "Robbed me with a rifle, he had a AK rifle." During this portion of the conversation your Affiant believes that **James FARLEY Jr.** informed **Brian VANCE** that the men robbed him **(FARLEY)** at gunpoint using a rifle. Your Affiant is aware from information learned during the investigation of the shooting that a rifle was found at the crime scene. During the conversation **James FARLEY Jr.** stated "He had just spent 1850.00 with me" to which **Brian VANCE** replied "Mannnnn I

39

could've, I knew it wasn't right, I knew it wasn't right." During this portion of the conversation your Affiant believes that **James FARLEY Jr.** informed **Brian VANCE** that one of the men that he **(FARLEY)** had shot had purchased $1,850.00 worth of controlled substances from him **(FARLEY)** in the past and that **Brian VANCE** informed **James FARLEY Jr.** that he **(VANCE)** felt that something was wrong with the deal.

On September 21, 2010 at 15:39:27, **Brian VANCE** using **TARGET TELEPHONE 2** made a follow up call to **James FARLEY Jr.** by calling **Bermisha VANCE'S** phone 931-931-378-9961. During this call **Brian VANCE** and **James FARLEY Jr.** continue to discuss the shooting. During the conversation **Brian VANCE** stated "Shit, they know your phone number, who name the phone in", "Who name your phone in?" to which **James FARLEY Jr.** replied It's a dudes number, it aint it aint in my name, it's uh, my name isn't in, uh, my name, this, this phone is in." During this portion of the conversation your Affiant believes that **Brian VANCE** asked **James FARLEY Jr.** if the phone he **(FARLEY)** used to contact the men could be tracked back to him and that **James FARLEY Jr.** informed **Brian VANCE** that the phone was not in his **(FARLEY'S)** name. During the conversation **Brian VANCE** stated "Ah, you shouldn't be talking in front of Pokey", "You aint out, you shouldn't have said nothing", "You can't tell nobody no stuff like that." Your Affiant believes that **Brian VANCE** is informing **James FARLEY Jr.** that he **(FARLEY)** should not be telling anyone about what happened and that he **(FARLEY)** should not be talking in front of an unknown person by the name "Pokey." During the conversation **Brian VANCE** stated "Shit, I would just get away from over there", "Da, da, do they know where you stay at?" to which **James FARLEY Jr.** replied "Naw, they don't know where I stay at, they, they think I from the bricks, Summit Heights. You hear me?" During this

40

portion of the conversation your Affiant believes that **Brian VANCE** is asking **James FARLEY Jr.** if the men knew where he **(FARLEY)** lived at and advised **James FARLEY Jr.** to get away from his **(FARLEY'S)** residence and that **James FARLEY Jr.** informed **Brian VANCE** that the men believed that he **(FARLEY)** lived at the Summit Heights housing complex. Your Affiant is aware that **James FARLEY Jr.** was arrested on September 21, 2010 for this shooting at his and **Bermisha VANCE**'S residence located at 1234 Commerce Street, Clarksville, Tennessee. During the conversation **Brian VANCE** stated "You aint leave nothing there of yours?" to which **James FARLEY Jr.** replied "Naw, I got everything, I got my phone back and my keys back." During this portion of the conversation your Affiant believes that **Brian VANCE** asked **James FARLEY Jr.** if he **(FARLEY)** left any thing at the crime scene and that **James FARLEY Jr.** informed **Brian VANCE** that he **(FARLEY)** had not. During the conversation **Brian VANCE** stated "Where you hit the other dude at?" to which **James FARLEY Jr.** replied "In, in the back, in the shoulder." During this portion of the conversation your Affiant believes that **Brian VANCE** asked **James FARLEY Jr.** where he **(FARLEY)** had hit the wounded man during the shooting and that **James FARLEY Jr.** informed **Brian VANCE** that he **(FARLEY)** had shot the man in the back or shoulder. During the conversation **Brian VANCE** and **James FARLEY Jr.** discuss where the shooting occurred and **Brian VANCE** stated "I said can nobody see" to which **James FARLEY Jr.** replied "Naw, hell naw." During this portion of the conversation your Affiant believes that **Brian VANCE** asked **James FARLEY Jr.** if anyone saw what happened and **James FARLEY Jr.** informed **Brian VANCE** that no one saw what happened. During the conversation **Brian VANCE** stated "You say they took the money too?" to which **James FARLEY Jr.** replied "Yeah they took my money too,

41

took, took, took uh 500 from me." During this portion of the conversation your Affiant believes that **James FARLEY Jr.** informed **Brian VANCE** that the men took $500.00 from him. During the conversation **Brian VANCE** stated "Why you ain't get his money, the money, why you ain't get the money back from them?" to which **James FARLEY Jr.** replied "Shit, cause, cause he was on the highway. I was just tellin them, just throw my phone, man, just throw my phone, ain't no more problems. He threw my phone to me, I took off. See, I couldn't pop, I couldn't pop him right there on the highway, cars and shit riding by." During this portion of the conversation your Affiant believes that **Brian VANCE** asked **James FARLEY Jr.** why he (**FARLEY**) did not retrieve that money from the men and that **James FARLEY Jr.** informed **Brian VANCE** that the wounded man that had the money had walked to the highway and that at that point he (**FARLEY**) had made contact with the wounded man again and that at that point he retrieved his phone and that he (**FARLEY**) could not shoot the man again because cars were traveling on the highway and that he (**FARLEY**) was concerned about being seen. During the conversation **Brian VANCE** and **James FARLEY Jr.** discuss what **James FARLEY Jr.** had gotten out of the dead man's pocket. **James FARLEY Jr.** stated "Naw, I ain't get his phone, he ain't have no phone, he called me on a pay phone. I went through his pockets and got your work back" to which **Brian VANCE** replied "All right." During this portion of the conversation your Affiant believes that **James FARLEY Jr.** informed **Brian VANCE** that he (**FARLEY**) went through the pockets of the dead man and retrieved the "work" (crack cocaine and cocaine) that belonged to **Brian VANCE**.

On September 21, 2010 at 15:46:30, **Brian VANCE** using **TARGET TELEPHONE 2** made a follow up call to **James FARLEY Jr.** by calling **Bermisha VANCE'S** phone 931-931-

42

378-9961. During this conversation **Brian VANCE** stated "Hey, I seen it on the call log, it say shootin." During this portion of the conversation your Affiant believes that **Brian VANCE** informed **James FARLEY Jr.** that he **(VANCE)** looked on a computer web site that lists calls dispatched by the Clarksville Police and that he **(VANCE)** saw that the Police had been dispatched to the scene of a shooting. During the conversation **Brian VANCE** stated "Somebody called the police, yeah, a bunch of time. Somebody called the police a bunch of times. Where is that at though" to which **James FARLEY Jr.** replied "I swear, right down the uh, I don't know. It's like on the bypass." During this portion of the conversation your Affiant believes that **Brian VANCE** asked **James FARLEY Jr.** where the shooting occurred and that **James FARLEY Jr.** informed **Brian VANCE** of the location. During the conversation **Brian VANCE** stated "How'd you get over there" to which **James FARLEY Jr.** replied "Shit, I rode my bike. And shit, they, they went off, went off a hard road, and uh, tried to play me. You know what I'm sayin. Give me your, Give me your keys, give me your phone and then shit, talkin about shit, I'm gonna drop your pho, I'ma, I'ma drop your phone of a half mile, I'mma drop your keys and phone off a half a mile down the road." During this portion of the conversation your Affiant believes that **James FARLEY Jr.** informed **Brian VANCE** that he **(FARLEY)** drove his motorcycle to meet the men and that once he **(FARLEY)** was there the men robbed him. During the conversation **Brian VANCE** stated "How they know you ain't have no strap" to which **James FARLEY Jr.** replied "Huh, shit, it was in my motorcycle seat. It was in my motorcycle seat, soon, soon as they start pullin off, I got to lightin, lightin there ass up." During this portion of the conversation your Affiant believes that **Brian VANCE** asked **James FARLEY Jr.** how the men knew that he **(FARLEY)** did not have a gun, "strap" and that **James**

43

FARLEY Jr. informed **Brian VANCE** that he **(FARLEY)** had his gun hidden in the seat of his motorcycle and that once the men started to pull off that he **(FARLEY)** started shooting at them. During the conversation **Brian VANCE** stated "What was they in a car?" to which **James FARLEY Jr.** replied "Yup, then they got to shootin at the, at the car trynna run my bike over then, then shit, he ran on top of the road, I got the power, I got to poppin them, they say don't shoot no more, don't shoot no more, I said give me my God Damn money back then. I said I'll kill both ya'll bitch ass white boys." During this portion of the conversation your Affiant believes that **James FARLEY Jr.** informed **Brian VANCE** that the men were in a car and that they attempted to run over his **(FARLEY'S)** motorcycle and then he **(FARLEY)** got the upper hand on the men and that the men asked him **(FARLEY)** to stop shooting. During the conversation **Brian VANCE** and **James FARLEY** discuss what would happen if **James FARLEY Jr.** was charged with the shooting. During the conversation **Brian VANCE** stated "Yeah, you'll beat it though", "You'll get something for just having the strap though", "And be violated, just be quiet." Your Affiant believes that **Brian VANCE** informed **James FARLEY Jr.** that if he **(FARLEY)** was charged with the shooting that he **(FARLEY)** would get some time for having a weapon but the he **(FARLEY)** could beat the shooting charges and that **Brian VANCE** informed **James FARLEY Jr.** to not talk about the shooting.

### Criminal History of James FARLEY Jr.

On October 12, 2006, **James FARLEY Jr.** was convicted in the Criminal Court of Montgomery County, Tennessee for sale of a schedule two controlled substance, a class C felony. **James FARLEY Jr.** was sentenced to five years to be served on Tennessee Community Corrections. According to arrest information obtained from the Montgomery County Sheriff's Office, **James**

44

**FARLEY Jr.** has been arrested multiple times on controlled substance charges and violent crimes charges in Montgomery County, Tennessee starting in the year 2003. The dispositions of these cases are unknown at the time of the writing of this affidavit.

## Dedric SHINE

During this investigation **Dedric SHINE** has been identified as a crack cocaine trafficker operating in Clarksville, Tennessee. On August 10, 2010 at 15:01:06, **Brian VANCE** using **TARGET TELEPHONE 2** received an incoming call from **Dedric SHINE** using phone 615-445-6132. During this conversation your Affiant believes that **Dedric SHINE** asked **Brian VANCE** if he **(VANCE)** had any crack cocaine that he **(SHINE)** could acquire. During the conversation **Dedric SHINE** stated "Ah, you got some blista?" to which **Brian VANCE** replied "Yea in a minute." Your Affiant is aware that the term "blista" is used by crack cocaine traffickers to describe crack cocaine. During the conversation **Dedric SHINE** stated "Alright just call me then?" Your Affiant believes that during this portion of the conversation your Affiant believes that **Dedric SHINE** informed **Brian VANCE** to call him **(SHINE)** when he **(VANCE)** had the crack cocaine. During the conversation **Dedric SHINE** stated "Yea, (inaudible) kept calling me saying shit they keep trying to get him to,to try say I was shooting." During this portion of the conversation your Affiant believes that **Dedric SHINE** informed **Brian VANCE** that an unknown male informed **Dedric SHINE** that the police were pressuring the unknown male for information concerning a shooting that **Dedric SHINE** was involved in. Your Affiant is aware that **Dedric SHINE** was arrested and is currently out on bond for a homicide that took place at the Summit Heights housing complex on July 4, 2009. During the remainder of the conversation **Dedric SHINE** and **Brian VANCE** discuss a court appearance made by **Dedric SHINE**.

On August 10, 2010 at 17:01:00, **Brian VANCE** using **TARGET TELEPHONE 2** made an outgoing call to **Dedric SHINE** using phone 615-445-6132. During this conversation

your Affiant believes that **Brian VANCE** informed **Dedric SHINE** that he **(VANCE)** had crack cocaine and that **Dedric SHINE** informed **Brian VANCE** that he **(SHINE)** wanted a quarter ounce of crack cocaine. During the conversation **Brian VANCE** stated "How much you want?" to which **Dedric SHINE** replied "A quarter." Your Affiant is aware that the term "quarter" is used by crack cocaine traffickers to describe a quarter ounce of crack cocaine.

On October 13, 2010 at 18:25:50, **Brian VANCE** using **TARGET TELEPHONE 2** received an incoming call from **Dedric SHINE** using phone 615-445-6132. During this conversation your Affiant believes that **Dedric SHINE** asked **Brian VANCE** to supply him **(SHINE)** with a half of an ounce of crack cocaine. During the conversation **Dedric SHINE** stated "you got some regular whip" to which **Brian VANCE** replied "yeah." Your Affiant is aware that the term "whip" is used by crack cocaine traffickers to describe crack cocaine. During the conversation **Dedric SHINE** stated "whatchu want for it I get a little half" to which **Brian VANCE** replied "three." Your Affiant believes that during this portion of the conversation **Dedric SHINE** informed **Brian VANCE** that he **(SHINE)** wanted to be supplied with a half ounce of "whip" crack cocaine.

On October 14, 2010 at 16:06:05, **Brian VANCE** using **TARGET TELEPHONE 2** received an incoming call from **Dedric SHINE** using phone 615-445-6132. During this conversation your Affiant believes that **Dedric SHINE** informed **Brian VANCE** that he **(SHINE)** wanted to acquire a quarter ounce of crack cocaine. During the conversation **Dedric SHINE** stated "Awe shit you ain't got no blister you can sell me?" to which **Brian VANCE** replied "Yeah whatcha want?" Your Affiant is aware that the term "blista" is used by crack cocaine traffickers to describe crack cocaine. During this portion of the conversation your

47

Affiant believes that **Brian VANCE** informed **Dedric SHINE** that he **(VANCE)** did have crack cocaine to supply **Dedric SHINE**. During the conversation **Dedric SHINE** stated "Shit probably like a quarter or something, it ain't moving too fast for me yet." During this portion of the conversation your Affiant believes that **Dedric SHINE** informed **Brian VANCE** that he **(SHINE)** wanted to purchase a quarter of an ounce of crack cocaine. Your Affiant believes that the reference made by **Dedric SHINE** "it ain't moving too fast for me yet" is a reference to the fact that **Dedric SHINE**'S customer base for crack cocaine was not high. Your Affiant is aware that **Dedric SHINE** was incarcerated in the Montgomery County Jail on a violation of probation from August 13, 2010 to October 13, 2010. Your Affiant believes due to the fact that **Dedric SHINE** was incarcerated he **(SHINE)** lost crack cocaine customers to other crack cocaine traffickers.

On October 15, 2010 at 14:28:33, **Brian VANCE** using **TARGET TELEPHONE 2** made an outgoing call to **Dedric SHINE** using phone 615-445-6132. During this conversation your Affiant believes that **Dedric SHINE** informed **Brian VANCE** that he **(SHINE)** was preparing to manufacture crack cocaine and that he **(SHINE)** asked **Brian VANCE** the correct amount of baking soda to use for the manufacturing process. During the conversation **Dedric SHINE** stated "I aint got to put that much soda to cook a ball of powder do I" to which **Brian VANCE** replied "Just put a ball of soda with it." Your Affiant believes that during this portion of the conversation **Dedric SHINE** asked **Brian VANCE** how much baking soda he **(SHINE)** should use to add to an eighth of an ounce of powder cocaine during the crack cocaine manufacturing process. Your Affiant is aware that baking soda is used in the crack cocaine manufacturing process. During this portion of the conversation your Affiant believes that **Brian**

48

VANCE informed **Dedric SHINE** to add an equal amount, an eighth of an ounce of baking soda, to the eighth of an ounce of powder cocaine. During the conversation **Dedric SHINE** stated "sold my xbox to Big Donnie for I was locked up for a ball of powder." During this portion of the conversation your Affiant believes that **Dedric SHINE** informed **Brian VANCE** that he **(SHINE)** had sold a X-Box video game to **Donnie PATTERSON** a/k/a Big Donnie for an eight of an ounce of powder cocaine before he **(SHINE)** was incarcerated on August 13, 2010. Your Affiant is aware that the term "ball" is used by cocaine traffickers to describe an eighth of an ounce of cocaine.

### Criminal History of Dedric SHINE

On August 17, 2006, **Dedric SHINE** was convicted in the Criminal Court of Montgomery County, Tennessee for sale of a schedule two controlled substance, a class B felony. **Dedric SHINE** was sentenced to six years to be served on probation.

On July 10, 2008, **Dedric SHINE** was convicted in the Criminal Court of Montgomery County, Tennessee for simple possession of a schedule two controlled substance, a class B misdemeanor. **Dedric SHINE** was sentenced to six months to be served on probation.

**Dedric SHINE** is currently out on bond and awaiting trial in Montgomery County, Tennessee, for homicide, and felon in possession of a firearm.

49

## **CONCLUSION**

Based on the above listed facts in this affidavit and the incorporated search affidavit, your affiant believes probable cause exists for the issuance of the requested arrest warrants.

FURTHER AFFIANT SAYETH NOT.

James R. Whitsett
Task Force Officer
Drug Enforcement Administration

Sworn to and subscribed to before me this 9ᵗʰ day of December, 2010 in Nashville, Tennessee.

E. CLIFTON KNOWLES
United States Magistrate Judge

50