**UNITED STATES DISTRICT COURT**
**MIDDLE DISTRICT OF TENNESSEE**
**NASHVILLE DIVISION**

| | | |
|---|---|---|
| **UNITED STATES OF AMERICA** | ) | |
| | ) | |
| v. | ) | **No. 3:11-00012** |
| | ) | **Judge Sharp** |
| **DEMETRIUS DUNCAN [14]** | ) | |
| **ALTO PARNELL [22] and** | ) | |
| **CHRIS YOUNG [27]** | ) | |

## MEMORANDUM

This criminal case arose from a narcotics distribution conspiracy centered in Clarksville, Tennessee. The original Indictment, returned on January 12, 2011, was in six counts and named twenty-eight Defendants. A twenty-count Superseding Indictment against fourteen Defendants was filed on April 17, 2013.

In the Superseding Indictment, Defendants Demetrius Duncan, Alto Parnell and Chris Young were charged in Count One with conspiring with Robert Porter and Brian Vance, among others, to distribute 500 grams or more of cocaine and 280 grams or more of crack cocaine between January and December 2010. Defendants Duncan and Parnell were also charged in Count Four with distributing cocaine within 1000 feet of Summit Heights, a public housing complex in Clarksville during the time frame of the alleged conspiracy, while Defendant Young was charged in Count Eleven with attempting to distribute cocaine and crack cocaine on December 10, 2010, within 1000 feet of the Genesis Teen Learning Center, a public school in Clarksville. Defendant Young was also charged in Count Twelve with possessing a firearm in furtherance of that attempted distribution, and in Count Thirteen with being a felon in possession of a firearm. Finally, Defendant Duncan was charged in Count Sixteen with possessing with intent to distribute crack cocaine on December 11,

2010; in Count Seventeen with possessing a firearm in furtherance of a drug trafficking crime between November and December 2010; and in Count Eighteen with possessing that firearm having previously been a previously convicted felon.

Trial commenced against Defendants Duncan, Parnell, and Young on August 6, 2013. On August 23, 2013, the jury returned its verdicts, finding Defendants guilty on all counts, except that Defendant Duncan was acquitted on the charge that he attempted to possess cocaine within 1000 feet of a public housing project.[1] Both at the end of the Government's case and the close of the evidence, all three Defendants moved for a judgment of acquittal, and those motions were taken under advisement. They now renew their motions and alternatively request a new trial (Docket Nos. 1795, 1806 & 1935). The Government has filed response briefs in opposition to these Motions, (Docket Nos. 1822, 1846 &1998), the last of which was received on January 24, 2014.

## I. STANDARDS OF REVIEW

### A. Motions for Judgment of Acquittal

In determining whether a motion for a judgment of acquittal should be granted, "[t]he relevant inquiry is whether, 'viewing the evidence in the light most favorable to the prosecution, *any* rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt.'" United States v. Fisher, 648 F.3d 442, 450 (6th Cir. 2011) (emphasis in original) (quoting Jackson v. Virginia, 443 U.S. 307, 319 (1979)). "Under the Jackson v. Virginia standard, a reviewing court does 'not reweigh the evidence, re-evaluate the credibility of witnesses, or substitute [its] judgment for that of the jury.'" Id. (citation omitted). "'Substantial and competent

---

[1] Count Thirteen against Defendant Young was not submitted to the jury because he pled guilty to the felon-in-possession charge shortly before trial.

circumstantial evidence by itself may support a verdict and need not remove every reasonable hypothesis except that of guilt.'" Id. (quoting United States v. Lee, 359 F.3d 412, 418 (6th Cir. 2004)).

**B.  Motions for New Trial**

"A motion for a new trial under Rule 33 of the Federal Rules of Criminal Procedure may be premised upon the argument that the jury's verdict was against the manifest weight of the evidence." United States v. Hughes, 505 F.3d 578, 592 (6th Cir. 2007).  "Generally, such motions are granted only 'in the extraordinary circumstance where the evidence preponderates heavily against the verdict.'" Id. at 592-93.

"In deciding Rule 33 motions based on the manifest weight of the evidence, . . . a district judge 'may sit as a thirteenth juror' and consider the evidence to ensure that there is no miscarriage of justice.'" United States v. Monoz, 605 F.3d 359, 373 n.9 (6th Cir. 2010) (citation omitted).  In this regard, the judge may assess the credibility of witnesses and the weight of the evidence.  United States v. Perales, 2013 WL 4529509 at *2 (6th Cir. Aug. 27, 2013).  Still, and while "[t]he decision of whether to grant a new trial is committed to the 'sound discretion of the trial judge, . . . this discretion should be exercised 'only in extraordinary circumstance[s].'" United States v. Canal Barge Co., 631 F.3d 347, 357 (6th Cir. 2011) (citation omitted).

## II.  ANALYSIS

A common theme and the primary focus of all of the pending motions is that there was insufficient evidence to support the conspiracy charge and, at most, the evidence showed a buyer-seller relationship between each Defendant and Porter or Vance.  The Court will consider that issue first, followed by a discussion of the additional arguments raised by each Defendant.

## A. Count One – Conspiracy

Count One of the Superseding Indictment alleges a conspiracy in violation of 21 U.S.C. § 846. It reads:

> Between in or around January 2010 to on or about December 11, 2010, in the Middle District of Tennessee and elsewhere, **[6] SHATIKA DIX, [10] QUINCE CROSS, [11] LAMONT COTTON, [21] CORNEL OLIVER a/d/a LIL C, [22] Alto PARNELL a/k/a AL-PISTOL a/k/a A.P., [25] JAMES FARLEY, JR. a/k/a BABY JAMES,** and **[27] CHRIS YOUNG a/k/a SOLDIER C** did combine, conspire, confederate, and agree with each other and with others known and unknown to the Grand Jury, including Robert Porter a/k/a Da Hero a/k/a Pooh and Brian Vance a/k/a Bird a/k/a Birdman a/k/a Beatrice, who are not defendants in this count, to knowingly and intentionally distribute and possess with the intent to distribute controlled substance, including 500 grams or more of a mixture and substance containing a detectable amount of cocaine, and 280 grams or more of a mixture and substance containing a detectable amount of cocaine base, that is crack cocaine, Scheduled II controlled substances in violation of Title 21, United States Code, Section 841(a)(1).
>
> In violation of Title 21, United States Code, Section 846 and Title 18, United States Code, Section 2.

(Docket No. 1409 at 1-2).

"In order to sustain a conviction for conspiracy under 21 U.S.C. § 846, the government must have proved (1) an agreement to violate drug laws, in this case 21 U.S.C. § 841(a)(1); (2) knowledge and intent to join the conspiracy; and (3) participation in the conspiracy." United States v. Martinez, 430 F.3d 317, 330 (6th Cir. 2005). "It is not necessary that the government prove a formal agreement, and the existence of a conspiracy may be inferred from circumstantial evidence that can reasonably be interpreted as participation in a common plan." United States v. Paige, 470 F.3d 603, 608-09 (6th Cir. 2006).

Moreover, a "conspirator need not be an active participant in every phase of a conspiracy, so long as he is a party to the general conspiratorial agreement." Id. at 609. And, "[w]hile mere

presence at the scene would be insufficient to establish participation, a defendant's participation in the conspiracy's common purpose may be inferred from the circumstances as well." Id. Indeed, "[o]nce a conspiracy is shown beyond a reasonable doubt, a defendant's connection to the conspiracy, 'need only be slight, and the government is only required to prove that the defendant was a party to the general conspiratorial agreement.'" United States v. Deitz, 577 F.3d 672, 677 (6th Cir. 2009) (quoting United States v. Salgado, 250 F.3d 438, 447 (6th Cir. 2001)).

Defendants are correct that a mere buyer-seller relationship does not establish a conspiracy. They made that argument at trial, the jury was apprised of Defendants' respective positions by way of the theory of defense instructions, and the jury was specifically instructed:

> A conspiracy requires more than just a buyer-seller relationship between the defendant and another person. In addition, a buyer and seller of drugs do not enter into a conspiracy to distribute or a conspiracy to possess with intent to distribute drugs simply because the buyer resells the drugs to others, even if the seller knows that the buyer intends to resell the drugs. To establish that a buyer or seller knowingly became a member of a conspiracy to distribute or a conspiracy to possess with intent to distribute drugs, the prosecution must prove beyond a reasonable doubt that the buyer and seller had the joint criminal objective of distributing drugs to others, in this case, cocaine and crack cocaine.

(Docket No. 1889, Tr. Trans. Vol. XI at 198-99).

Unfortunately for Defendants, the jury concluded that each was a member of the conspiracy, thereby implicitly rejecting their buyer-seller defense. Having considered the trial record and the arguments of the parties, the Court cannot say that, when the evidence is viewed in a light most favorable to the Government, no rational finder of fact could have reached the same conclusion. Moreover, having presided over the case, and after weighing the evidence and considering the credibility of the witnesses, the Court finds that the jury's verdicts on the conspiracy count are not against the manifest weight of the evidence such that sustaining the verdicts would result in a

miscarriage of justice to any of the Defendants.

**1.** ***Conspiracy Charge as to Defendant Young***

Defendant Young argues that "there was insufficient evidence to establish that Mr. Young's relationship to Robert Porter was anything other than that of buyer-seller" and "[i]n fact every piece of evidence supports the fact that Mr. Young only had a buyer-seller relationship with Mr. Porter." (Docket No. 1795 at 1-2). Actually, there was more than sufficient evidence for the jury to find Defendant Young guilty of the conspiracy charge, including, but not limited to, numerous tape recorded conversations between him and Porter.[2]

The Sixth Circuit has "previously recognized 'that the trust involved in fronting drugs under a delayed payment or credit arrangement suggests more than a buyer-seller arrangement between the parties,'" United States v. Wettstain, 618 F.3d 577, 585 (6ᵗʰ Cir. 2010) (citations omitted), and, in fact, has stated that fronting drugs is "considered strong evidence of a relationship that goes beyond the ordinary buyer-seller relationship," United States v. Bakri, 505 F. App'x 462, 467 (6ᵗʰ Cir. 2012).

Here, the Government presented evidence that Porter fronted drugs to Defendant Young on several

---

[2] Those recorded conversations were between a telephone with the number (409) 431-8197 and telephones with the phone numbers (931) 249-3145 and (931) 624-4518. At trial, the lead investigator on the case, Deputy James Whitsett, identified the phone with the 409 area code as belonging to Porter and identified Young as the speaker on the other two phones in the pertinent conversations. Part of his identification was based upon hearing Young speak during an earlier court proceeding and Whitsett testified that he had "no doubt in my mind" that it was Young's voice. (Tr. Trans. Vol. VI-B at 88).

A "speaker's voice may be identified by opinion testimony 'based on hearing the voice at any time under circumstances that connect it with the alleged speaker,'" and '[o]nce a witness establishes familiarity with an identified voice, it is up to the jury to determine the weight to place on the witness's voice identification.'" United States v. Cox, 2013 WL 6097902, at *3 (11ᵗʰ Cir. Nov. 21, 2013) (citations omitted); see also, United States v. Jones, 600 F.3d 847, 858 (7ᵗʰ Cir. 2010) ("Challenges to the accuracy of a voice identification 'go to the weight of the evidence, and the issue is for the jury to decide'") (citations omitted).

occasions.

In a September 12, 2010 conversation, Young told Porter that he would have "fifty five all together" the next day to "go on the old." (Govt. Ex. 98).[3] This is hardly self-explanatory, but from the testimony at trial, including that of Deputy Whitsett, it is clear that the conversation was intended to convey that Young would have $5,500 to pay Porter for cocaine that had already been fronted, or so a reasonable jury could have concluded. The jury could also conclude that, in a recorded conversation two days later, Young told Porter that he was still working on getting the money to pay him back because, after Porter asked, "was you ready your way?" Young replied, "I had plannin on havin like three or four on that little shit I still owed but hell, the nigga still ain't come through with what uh, what he owe me, but uh, I got the fifty two ready." (Govt. Ex. 105a).

The jury could also reasonably conclude that several September 24, 2010 conversations were in relation to Young paying Porter back for drugs previously received. In the first, after Porter asked, "what you lookin like?" Young explained that he was "watin on my homie" but that he had, "like forty-six." (Govt. Ex. 151a). Two hours later, Young called Porter and told him that he was waiting on "my nigga that owed me on somethin I had done up" and that he was "fixin to give me what he owe me and then that make me have like 49" but that he had "the 46" and was "watin on my little homie right now." (Govt. Ex. 151-1).

Moreover, the jury could reasonably conclude that there was more than a mere buyer seller relationship between Porter and Young because Porter trusted Young enough that he did not always count the money immediately after an exchange. See, United States v. Sanders, 273 F. App'x 553,

_____

[3]Quotations to the recorded conversations are as they were transcribed and without correction of the grammar utilized by the speakers.

556 (7th Cir. 2008) (evidence of trust where dealer "did not always count the money" upon receipt). In a September 17, 2010 conversation, Porter called Young to tell him that he was "off" on the money, that while some of the stacks were right, others were short, and that "all together it was 6 . . . yeah 6135," (Govt. Ex. 132), which the jury could reasonably interpret to mean that the amount of money Young gave Porter was $6,135 short of that which was owed. Additionally, Donnie Patterson[4] testified that he was present on a couple of occasions when Young gave money to Porter and recalled that the money was not counted until later.

Those tapes also show that Porter gave Young tips on how to cook the cocaine so as to increase yields, and that Young followed those tips, presumably because Porter wanted to help Young because it would inure to Porter's benefit and because Young trusted Porter's advice. From a string of recorded conversation on September 18, 2010, the jury could conclude that (1) Young was seeking Porter's counsel on how best to cook the cocaine base into crack; (2) Young believed that Porter would not have diluted the product; (3) Porter indicated that others had also got the same product but did not complain and offered to help Young recook the crack so as to result in a higher quantity of crack for Young; and (4) Young, following Porter's advice to cook it longer, was able to obtain a larger quantity of crack cocaine. (Govt. Ex. 136). Similarly, from a recorded call on December 1, 2010, the jury could conclude that Young and Porter were discussing the quantity of crack they were able to cook from a batch, with Porter telling Young that he and others were doubling what Young was getting.[5]

---

[4] Patterson pled guilty to the conspiracy charge. He testified at trial that he had a "drug trafficking relationship" with "multiple people," including both Porter and Vance, for many years, and that he had known Young for four or five years.

[5] In the conversation, Young told Porter that he "had been gettin em twenty fours and twenty fives with ease," and Porter saying, "I did fifties," and "everybody else tell me fifties." (Govt. Ex. 199).

The referenced conversations between Porter and Young are but a handful of the many introduced at trial, but those same conversations lend further support to the conclusion that the Porter/Young relationship was more than that of a buyer and seller given (1) the repeated contacts from September 2010 until the take-down on December 19, 2010, and (2) the amount of drugs involved. "[E]vidence of repeat purchases provides evidence of more than a mere buyer-seller relationship," and "'[a] large volume of narcotics creates an inference of conspiracy." United States v. Brown, 332 F.3d 363, 373 (6th Cir. 2003) (quoting United States v. Bourjaily 781 F.2d 539, 545 (6th Cir. 1986)).

To be sure, Defendant Young was not shown to be buying or selling in kilo amounts, but the $5,000 and $6,000 referenced in the tapes suggests far more than personal use.[6]  See United States v. Holland, 101 F. App'x 600, 602 (6th Cir. 2004) ("the amounts Holland sold to Crittenden were inconsistent with mere personal use in a buyer-seller relationship and support the factual basis for a conspiracy to distribute drugs"); United States v. Saunders, 1999 WL 465909, at *2 (6th Cir. July 27, 1998) ("crack worth $7,000 can be considered a large amount'); United States v. Alexander, 714 F.3d 1085, 1090 (8th Cir. 2013) ("A true individual buyer-seller case involves evidence of only 'a single transient sales agreement and small amounts of drugs consistent with personal use'" while "the purchase of wholesale drug quantities on numerous occasions 'raises an inference of knowledge of a drug distribution venture that goes beyond an isolated buyer-seller transaction'") (citation omitted).

The Government introduced many other recordings which it claims showed Young and

---

[6] In addition to those figures, a reasonable jury could conclude from an October 22, 2010, recording that Young had previously paid $9,450 to Porter for cocaine. (Govt. Ex. 173). Moreover, and as will be explained in more detail later, when Young and Porter were arrested on December 10, 2010, cocaine and $10,000 in cash were recovered at the scene.

Porter arranging drug and/or money transfers. At trial, defense counsel argued to the jury that the repeated contact was easily explained: Young was an aspiring rap artist and Porter was helping him in this endeavor, an interpretation of the evidence that is consistent with some references on the recordings to "CDs" and the fact that Porter had a recording studio. While this is one gloss that could be placed on the evidence, a jury is "free to draw inferences, assess witnesses' credibility, and interpret the evidence for or against" a defendant. United States v. Harris, 200 F. App'x 472, 503 (6th Cir. 2006). Moreover, even if a defendant's "account of events and their legal significance is itself reasonable," this does "not obligate the district court to disturb the decision of [defendant's] peers." Id.; see also United States v. Lowe, 172 F. App'x 91, 97 (6th Cir. 2006) (the jury is free to believe an officer's interpretation of the evidence over a defendant's view).

The number of decisions discussing the buyer-seller relationship in the context of an alleged conspiracy are many, but "[o]ne proposition seems generally uncontroversial: if a person buys drugs in large quantities (too great for personal consumption), on a frequent basis, on credit, then an inference of conspiracy legitimately follow." United States v. Brown, 726 F.3d 993, 1000 (7th Cir. 2013). From the evidence presented by the Government at trial, the jury could certainly draw that inference in this case with respect to Defendant Young, and the Court cannot say that the jury's drawing of such an inference resulted in a miscarriage of justice.

### 2. Conspiracy Charge as to Alto Parnell

In his Motion as to the conspiracy charge, Parnell quotes verbatim the phone conversations in which he was a participant, notes that there were only eighteen such calls between August 6, 2010, and November 22, 2010, claims that only 15 of those calls showed that Parnell was "interested

in purchasing small quantities of cocaine,"[7] and calculates that his contact "with Vance occurred 3 or 4 days per month," with "calls often separated by weeks." (Docket No. 1935 at 25). He also points out that only four witnesses testified as to his alleged involvement in the conspiracy, including Deputy Whitsett who, for the most part, laid out the investigation and provided a foundation for the intercepted calls. While Parnell effectively concedes that he dealt cocaine in small amounts, he argues that those tapes and that testimony only showed a buyer-seller relationship with Vance.

In response, the Government begins by arguing that "[t]he defense motion acknowledges that the evidence show that Vance repeatedly fronted drugs to Parnell for re-sale." (Docket No. 1998). The Court finds no such acknowledgment in Defendant's Motion. Instead, Parnell argues that the evidence showed at most that he was fronted drugs on one occasion when, according to Shatika Dix she fronted him one-half of an eight ball on credit in accordance with Vance's directive. This small amount would not alone suffice to show more than a buyer-seller relationship. See United States v. Villasenor, 664 F.3d 673, 680 (7th Cir. 2011) ("evidence that a supplier extends credit to an individual purchasing small quantities of drugs for personal consumption [standing alone] would not suffice to establish a conspiracy.").

Nevertheless, the Court finds that there was more than sufficient evidence for a reasonable jury to conclude that Parnell was a member of the conspiracy to distribute drugs in Summit Heights. In a November 20, 2010, conversation, Parnell informed Vance that he was almost caught by agents walking out of "Toya's crib" with an ounce of cocaine. (Govt. Ex. 191). The jury could have found

_____

[7] Usually, Parnell sought 3.5 grams of cocaine from, but on one occasion he sought 5 grams and on another 7 grams.

that this was a reference to Latoya Ogburn, Parnell's cousin, because, while Ms. Ogburn denied that Parnell was in her apartment (unit 14D) in Summit Heights that day, he was seen (and approached by) Deputy Whitsett near that building, and Shatika Dix claimed that Ms. Ogburn stated that she had allowed someone, likely Parnell, to store cocaine in her dryer at around that time.[8]   This evidence hardly establishes a conspiracy, but it does show Parnell carrying cocaine in Summit Heights in close proximity to Shatika Dix's apartment, which was a drug house supplied by Vance.

That conversation also shows Vance's knowledge of several other co-conspirators, including "Mook," "Whirley," "Boosie," "Lil C," and others.   Those nicknames were shown to be the monikers for Dedric Shine, Demetrius Duncan, Robert Ligon, and Donald Ewing, respectively, all of whom were charged in connection with dealing in Summit Heights as a part of the conspiracy.

"[A]lthough a defendant's 'mere association with conspirators is not enough to establish participation in a conspiracy,' . . . 'a defendant's guilty knowledge and voluntary participation may be inferred from surrounding circumstances,'[and] 'the defendant's actions and reactions to the circumstances." United States v. Liuna-Santillanes, 2014 WL 486196, at *5 (6th Cir. Feb. 7, 2014) (citations omitted).   Parnell's and Vance's discussions about  "Mook," "Whirley," "Boosie," "Lil C," and the like were hardly innocuous.   Rather, those individuals were discussed in the context of cocaine trafficking and, in particular, the heat dealers were feeling because of increased police presence in the projects.   In fact, Parnell talked about needing security and getting rid of his Monte Carlo, and both discussed "doing something different," including enlisting younger individuals to sell narcotics.

_____

[8] Admittedly, this evidence is far from overwhelming. Ms. Dix was a reluctant and evasive witness at trial, prompting the Court at one point to caution her to "quit playing games." (Tr. Trans. Vol. X at 50). However, Parnell himself stated that he was almost caught with cocaine coming out of Toya's crib and the jury was entitled to infer that the reference was to his cousin.

In that same conversation, Vance also observed that "if we fall, it's a [w]rap." Even though Vance was a ranking member of the Vice Lords, the jury could properly surmise that he was not referring to the royal "we," but rather to the notion that their drug trafficking venture would be over if both he and Parnell were busted.

An August 23, 2010 conversation further shows Vance's knowledge of and dealings with others in the conspiracy to distribute drugs in Summit Heights  In that call, Parnell told Vance that he was "in the horseshoe" and that he was seeking a "basket."[9]  Vance told Parnell to get it from "Grindhard," the nickname for Defendant Joshua Dix. (Govt. Ex. 60).[10]  In a phone call just four days later, Parnell told Vance he was  "on deck" in the horseshoe seeking cocaine, but Vance advised him that he might not like it because it would not properly turn into crack, but instead went back to liquid form.  (Govt. Ex. 73).  This could just be a seller trying to keep a buyer happy, but an equally plausible understanding of the conversation is that Vance believed Parnell trusted him not to provide an inferior product.  That conversation also included discussions about Sam Lucas, Money Marvin, and "Young Money" (Defendant Kronski Howard), conversations that were not about those individuals' well-being, but conversations relating to those individuals in the sale and cooking of cocaine, and the yields that they obtained.

Parnell's knowledge of Kronski Howard and the latter's cocaine dealing in Summit Heights is further confirmed by a September 8, 2010 telephone call.  While Parnell called Vance's number, the phone was answered by Howard ,who identified himself as "Units."  Parnell then asked Howard

---

[9]  The "horseshoe" is a reference to a semi-circular street in Summit Heights that looks like a horseshoe.  A "basket" is a reference to an eight-ball or an eighth of an ounce of cocaine.

[10]  In another conversation dated October 9, 2010, Vance referred Parnell to Grindhard to get the "whip" he was seeking.  "Whip," as opposed to "blista" is a lower quality of crack cocaine.

to see if Vance had some "blista," and when that answer was in the affirmative, Vance told him he wanted some. (Govt. Ex. 91). A week later, Parnell sought more "work," and Vance told him he was out, but referred him to "Tweezy" as a possible source. Again this evidence suggests not a mere buyer-seller relationship between Vance and Parnell, but participation by Parnell with others to secure product.

In late November 2010, after Vance was unable to get cocaine from Porter for a couple of days, Parnell offered a possible solution. In a November 21, 2010 conversation, Parnell told Vance that he had heard from "Swerve" that Willie and his brother "Trick" had "hit a lick" in Nashville, Atlanta, or somewhere south, and had scored six ounces of "soft," said to be of good quality or "fish scale."[11] Parnell said that he was offered one ounce and a second ounce on credit. In response to Vance's question about whether there was a lot, Parnell said that he had heard it was a quarter to a half brick and that he would call "Trigger" to see if he could get some for both himself and Vance. (Govt. Ex. 196). This shows far more than a buyer seller relationship: it shows Parnell's willingness to help supply Vance with cocaine.

The testimony of the last witness called by the Government also suggested that Parnell had more than a buyer-seller relationship with Vance. Jevita Banister lived at 997 East Happy Hollow in Summit Heights. She testified that she allowed Vance to cook cocaine into crack in her apartment, in exchange for which she received $20 or a half gram of powder cocaine each time. She also testified on direct examination that Vance cooked crack at her house three to four times a week over an approximately six-month period, and that he generally cooked an eight-ball worth of crack. each time She further testified that Whirley (Defendant Duncan) and Pistol (Defendant Parnell)

---

[11]"Hit a lick" is a reference to a home invasion drug robbery. "Soft" is a reference to powder cocaine.

would come over and cook crack, and that Parnell would cook crack with Vance.  On cross-examination, however, Ms. Banister stated that  Parnell had come over once, and that when he came over a second time he was asked not to return because he and Ms. Banister's boyfriend, Dwayne Connerly, had issues.  Even if only the testimony elicited on cross-examination is believed[12] and not the testimony which suggested that Parnell was at the apartment more often with Duncan or Vance, it shows more than a buyer-seller relationship between Parnell and Vance.  It shows those two engaged in a joint venture to cook crack cocaine.

### 3. Conspiracy Charge as to Demetrius Duncan

Duncan argues that the evidence as to him showed nothing more than "a long-term friendship and a buyer-seller relationship between" him and Vance.  (Docket No. 1806 at 3).  He argues:

> Over the course of the trial, which lasted approximately three weeks, the proof the government chose to introduce against Defendant Duncan could likely have been presented in less than two hours. Instead, the jury was bombarded with countless recitations of "the Robert Porter Drug Trafficking Organization;" myriad tales of bad acts by others including shootings, robberies and murders; and, the introduction of prejudicial and cumulative exhibits recovered from individuals and locations wholly unrelated to Defendant Duncan.  When the few kernels are sifted from the mountains of chaff, there is remarkably little proof relating to Defendant Duncan or his alleged involvement in this charged conspiracy.

(Id. at 2).

Contrary to Duncan's argument, there was more than a "little proof" linking him to the charged conspiracy, primarily in the form of recorded conversations.  Prior to outlining that proof, however, a couple of observations are in order.

First, Defendants were not charged with being a part of the "Robert Porter conspiracy," but

---

[12]  The Court notes that Ms. Banister is an admitted drug user and was not charged in this case. Nevertheless, and notwithstanding her apparent contradictions, the Court found her to be a credible witness, and a witness from whom the jury could find that Parnell cooked crack with Vance in her apartment on at least one occasion.

rather as being a part of a conspiracy that was dealing cocaine in Summit Heights. While Porter was unquestionably the kingpin of that enterprise, others played significant roles, including Vance, who was shown to work under Porter. See United States v. Vaughan, 512 F. App'x 459, 461 (6th Cir. 2013) ("'conspiracies to distribute narcotics . . . normally involve numerous sales and resales of drugs until they reach the ultimate consumers") (citation omitted).

Second, while "less than two hours" is overly optimistic, it is clear that the evidence as to Duncan could have been presented in a relatively short period of time. However, because Duncan (and Young and Parnell for that matter) was charged with being a part of a conspiracy, the Government was required to "prove the existence of the conspiracy beyond a reasonable doubt." United States v. Young, 496 F. App'x 570, 575 (6th Cir. 2012). This necessarily required that the Government introduce evidence beyond that involving Defendants Young, Parnell, and Duncan, as their participation could not be established without an overview and a showing of the dynamics of the conspiratorial organization. This also led to the introduction of evidence about the Vice Lords, not just because many participants in the conspiracy were in that organization and it showed their ties to each other, but also because some of the terms utilized in conversation were used by members of that gang.[13]   It was made clear to the jury, however, that none of the Defendants on trial were members of that organization.

Third, the Government did elicit some testimony about a couple of murders, but from the Court's perspective this was not gratuitous or done to poison the jury. For example, during the

---

[13] For example, Vance repeatedly answered phone calls by saying, "what up joe"" and signed off with "Cinco." Deputy Whitsett explained that Vice Lords used "joe" as a greeting of respect, and "Cinco" was a reference to the points of a star which is a gang sign. Additionally, some of the tapes referenced "quarter." This usually meant a quarter of an ounce, but, depending on context, could also be a reference to discipline imposed on a Vice Lord member.

testimony of Wanda Mills, the Executive Director of the Clarksville Housing Authority, it came out that the surveillance cameras in Summit Heights were destroyed after Brandon Bootner, a Vice Lord soldier, was murdered. At that point, the Court held a sidebar with counsel and, after discussion, the inquiry proceeded on without further questioning about the murder. Murder was also discussed in a September 21, 2010 conversation between Young and Porter, when Young stated that "they claim Baby James killed somebody and went and hid in his momma's house." (Govt. Ex. 142-1). While that conversation did not include specific discussions about drugs, the Government did not introduce it merely to inject a murder into the case. Rather, it showed that Young knew Baby James (Defendant James Farley[14]), that Young also knew that Porter knew Baby James, and suggested that there was some reason why Young felt compelled to report the allegation that Baby James was involved in a murder to Porter.

Fourth, as with the testimony about the Vice Lords, the jury was informed that none of the Defendants were tied to the murders.[15] Moreover, the jury was specifically instructed that the Defendants were on trial only for the charges contained in the Superseding Indictment, and the jury was to give separate consideration as to each Defendant based upon the evidence presented. The jury is presumed to follow its instructions, United States v. Lawrence, 735 F.3d 385, 403 (6th Cir. 2013), and Defendant Duncan has offered nothing to rebut that presumption.

Turning to the substantive evidence against Duncan, it is clear that he repeatedly obtained crack cocaine from Vance, that the receipt was for resale, and that there was more than a mere

---

[14] Evidence from other wiretaps indicated that Farley shot the individual after that individual tried to rip him off.

[15] During a sidebar, the Government revealed that Defendant Parnell may be indicted for one of the murders. The jury, of course, was not aware of that.

buyer-seller relationship between the two. For example, the evidence showed that Duncan had knowledge of others in the conspiracy. This is evidenced by an August 12, 2010 call in which Duncan was seeking drugs from Vance, Vance told him he was "at that girl house" and Duncan told him to "get me a quarter ready." (Govt. Ex. 41a). From that call, a jury could reasonably infer that the "girl" was Jevita Banister, that Vance was there cooking, and that Duncan wanted a quarter of an ounce of the batch. More generally, Duncan had knowledge that others like him were getting drugs from Vance for resale because, in an August 23, 2010 phone call, Vance told him that he could not see how the cocaine Duncan had received was "short" as claimed because "[e]verybody else says theres was 2.8." (Govt. Ex. 59a).

Additionally, Duncan, like Parnell, got cocaine not just from Vance, but from others as well. In an August 18, 2010 call, Duncan told Vance that he needed to get some cocaine for a customer, and when Vance told him he had nothing ready, Duncan was referred to "Young Money" (Kronski Howard). In an August 22, 2010 conversation, Duncan told Vance, "you got a dummy with you sellin dope," because "Grindhard" (Joshua Dix) was "gonna have me come to the horseshoe" to buy drugs, "knowing the Police at the bottom[.]" (Govt. Ex. 57a). In an October 2, 2010 call, when Vance told Duncan that he did not have the half ounce of powder cocaine that Duncan needed, Duncan asked what Donnie had, a reference to Donnie Patterson who distributed large amounts of cocaine for Porter.

The notion that Duncan was in a simple buyer-seller relationship with Vance is further undermined by the fact that Duncan knew that Porter was Vance's supplier, and also by the fact that Duncan told Vance about other possible suppliers. This is confirmed by a September 7, 2010 call in which Duncan asked Vance if "Robert" was still selling ounces. In that same conversation,

Duncan told Vance that he knew somebody who might have some "jumper" (high quality crack cocaine) and who would front 2.5 ounces for an equivalent amount bought. Duncan's knowledge of and past dealings with Porter is further confirmed by a conversation on September 13, 2010, in which Duncan asked Porter if he had $600 worth of crack cocaine, and if Porter was going to do what he had promised.[16] (Govt. Ex. 99).

Duncan's buyer-seller defense is also undermined because held drugs and Inositol[17] for Vance on occasion. In a November 17, 2010 recording, Duncan and Vance are heard trying to figure how many of Vance's "blistas" Duncan still had, with Vance thinking that Duncan had seven of the eleven left. (Govt. Ex. 187). In a conversation two days later, Vance called Duncan to find out where he had put the Inositol,[18] and two days after that the two tried to reconcile whether Duncan had 13 or 14 of Vance's blistas. (Govt. Exs. 190 & 192).

Duncan's and Vance's mutual interests in the drug trade is also demonstrated in a November 14, 2010 conversation. Duncan called Vance to ask whether they could get their hands on "nine ounces [of] soft" because Duncan had someone he could sell it to. Vance told him to ask "Young Money," and also said that he, too, would call around in search of the product. (Govt. Ex. 197).

Testimonial evidence also linked Duncan to the conspiracy and took him beyond the realm of a simple buyer and reseller of Vance's wares. It was Duncan who introduced both Parnell and

---

[16] It was never made clear what that promise consisted of, although the Government speculated that it may have been an offer by Porter to cook cocaine into crack. Regardless, the conversation showed prior contact between Porter and Duncan, and the jury could reasonably infer that it may have been in relation to cocaine given that Duncan was seeking $600 worth of cocaine.

[17] Inositol is a cutting agent for cocaine.

[18] From the context of the call, it appears that Vance was in Duncan's residence, which, as the Government suggests, shows an element of trust.

Vance to Ms. Banister and it was that introduction which led to Vance being able to cook crack cocaine at her apartment three to four times a week. Additionally, Patterson testified that he called Vance who was then cooking crack at Duncan's house. While counsel argued in closing that this showed just one occasion, a December 4, 2010, recording indicated that Vance was on his way to Duncan's house to cook crack, (Govt. Ex. 202), suggesting that Vance cooked at Duncan's on more than one occasion.[19]

As noted at the outset, the Government is only required to show a Defendant's "slight" connection to a conspiracy. The evidence presented was sufficient to establish that Duncan was a part of the conspiracy to distribute cocaine in Summit Heights. Moreover, Duncan has not presented extraordinary circumstances so as to call that verdict into question.

## B. Remaining Counts and Arguments

### 1. Defendant Young

In addition to the conspiracy charge, Defendant Young was charged in Count Eleven with attempting to possess cocaine with intent to deliver within 1000 feet of a public school, and in Count Twelve with using or possessing a firearm in furtherance of a drug trafficking crime. Both of those charges stemmed from the take-down arrest on December 10, 2010, at a Shell station located at 1820 Fort Campbell Boulevard, which is indisputably within 1000 feet of the Genesis Learning Center.

Young asserts that there was insufficient evidence to show that he possessed with intent to distribute cocaine within the protected area, and that there was insufficient evidence to establish that

---

[19] This seems all the more reasonable since Vance had called Duncan to find out where the Inositol was, and since Inositol was found during a search of Duncan's residence.

he possessed a firearm in furtherance of that attempted possession. At trial, he argued that (1) he was simply at the wrong place at the wrong time, (2) that the intended recipient of Porter's cocaine was Mike Brown, as evidenced by tape recorded conversations; and (3) that he was meeting Porter so that they could go into the studio as evidenced by their telephone conversations leading up to the meet and the CDs that were found in Young's car at the time of the arrest.

Defendant Young made a plausible argument, but deciding whether to believe that argument was for the jury. He has not carried the "very heavy burden" of establishing that the evidence was insufficient," United States v. Chavis, 296 F.3d 450, 455 (6th Cir. 2002), nor does the Court believe that sustaining his conviction on Counts Eleven and Twelve would be against the manifest weight of the evidence.

The take-down was preceded by a string of phone calls from Young to Porter, the last of which resulted in the meeting at the Shell station. Prior to the meeting, Porter was under surveillance, a warrant having been issued for his arrest. After picking up Dimitri Johnson at Positive Image, a barber shop, and, after a stop at Johnson's house, the pair traveled to the Shell station in Porter's gold Chrysler.

Meanwhile, Young pulled up to a gas pump and went into the Shell station.[20] Shortly thereafter, Porter arrived and parked at an adjacent gas pump, such that his passenger door was next to the passenger door of Young's white Charger. Dimitri Johnson exited Porter's Chrysler and went into the station. As he did so, he crossed paths with Young who came out of the store and went to the passenger side of his vehicle. After reaching into his car, Young turned around and leaned into the passenger side of Porter's Chrysler. Officers then converged on the scene and arrested both

---

[20] The events at the Shell station were captured by surveillance cameras.

Young and Porter. Officers also arrested Johnson who was still inside the gas station.

At the time of the arrest, Porter was standing towards the rear of the Chrysler on the driver's side. Young was at the open passenger door. Young was ordered to the ground and, when he was handcuffed, officers found $10,000 in cash, either under his body or next to his head. Inside Porter's Chrysler, officers found 192.4 grams of powder cocaine on the passenger seat and 159.4 grams of cocaine base in the console. Inside Young's car, officers found a loaded handgun in the console and a set of digital scales.

Given the distance between the Shell station and the Genesis Learning Center, given the relationship between Porter and Young, given the phone calls setting up the meeting, given the existence of both crack and powder cocaine in Porter's car, given the digital scales and handgun in Young's car, and given Young's proximity to the $10,000 in cash, a jury could properly conclude that Young attempted to possess with intent to distribute crack cocaine within 1000 feet of a public school.

The jury could also easily conclude that the firearm found in Young's car was in furtherance of that drug trafficking crime. "To prove the 'in furtherance' element, the Government must show a 'specific nexus between the gun and the crime charged,' <u>United States v. Mackey</u>, 265 F.3d 457, 462 (6th Cir. 2001), <i>i.e.</i>, the firearm must 'advance, promote, or facilitate the crime.' <u>United States v. Paige</u>, 470 F.3d 603, 609 (6th Cir.2006)." <u>Luna-Santillanes</u>, 2014 WL 486196, at *7. "Factors relevant to finding a nexus between the firearm and the crime include whether the gun was quickly and easily available for use, what type of gun it was, whether it was loaded, the legality of its possession, the type of drug activity conducted— e.g., the size of the sale—and the time and circumstances under which the gun was found." <u>Id</u>.

Here, the firearm was a loaded handgun with a round in the chamber. It was readily available for use – just steps away from powder and crack cocaine, and a large sum of cash. Further, its possession by Young was unlawful given his prior felony conviction. This evidence was sufficient to support the jury's verdict of guilt on Count Twelve and the Court finds no basis to disturb that verdict.

### 2. *Defendant Parnell*

In addition to the conspiracy charge, Defendant Parnell was charged in Count Four with possessing with the intent to distribute cocaine in Summit Heights between January and December 2010. He argues that, in the absence of sufficient evidence to support the conspiracy charge, he is entitled to acquittal or a new trial on Count Four because the jury may not have unanimously agreed on the date(s) he possessed and distributed cocaine in Summit Heights. As already noted, however, the Government presented sufficient evidence to support the conspiracy charge as to Defendant Parnell and the Court finds no basis to disturb the jury's verdict of guilt on that charge.

In any event, and leaving aside that Defendant never requested a specific or augmented unanimity instruction, "[t]he general rule is . . . that only a general unanimity instruction is required even where an indictment count provides multiple factual bases under which a conviction could rest," unless there is "'a genuine risk that the jury is confused or that a conviction may occur as the result of different jurors concluding that a defendant committed different acts.'" U.S. v. Damra, 621 F.3d 474, 504-05 (6th Cir. 2010) (citation omitted). That is, "a jury instruction addressing specific or augmented unanimity is necessary [only] if '(1) a count is extremely complex, 2) there is a variance between the indictment and the proof at trial, or 3) there is a tangible risk of jury confusion.'" United States v. Algee, 599 F.3d 506, 514 (6th Cir. 2010) (quoting United States v.

Krimsky, 230 F.3d 855, 860 (6th Cir. 2000)).  None of those factors is present here: Count Four was straight-forward; the proof at trial clearly established that Parnell possessed and distributed drugs in Summit Heights during the time frame of the Indictment, and, given that proof, there was no risk that the jury was confused about its task in relation to Count Four.  See United States v. Cooper, 64 F. App'x 434, 437-38 (6th Cir. 2003) (where indictment charged that defendant possessed firearm "[f]rom on or about December, 1997, the exact date being unknown to the Grand Jury, to on or about July 28, 1998," specific unanimity instruction was not required because evidence showed defendant was a felon-in-possession during a time frame that was well within the dates alleged in the indictment).

### 3. *Defendant Duncan*

In addition to the conspiracy charge, Defendant Duncan was charged in Count Four with distribution of a controlled substance in a protected area, in Count Sixteen with possession with intent to distribute cocaine and marijuana, in Count Seventeen with possessing a firearm in furtherance of a drug trafficking crime, and in Count Eighteen with being a felon in possession of a firearm.  As indicated, the jury acquitted Duncan on Count Four and he does not challenge his conviction on Count Eighteen.  He argues, however, that there was insufficient evidence to support his convictions on Counts Sixteen and Seventeen.

Count Sixteen and Seventeen arose as a result of a December 11, 2010 pre-dawn raid of Duncan's residence at 964 Woody Hills Drive.  At the time of the raid, Courtney Darden was present.

Ms. Darden testified that she had known Duncan for several weeks and went to his residence once or twice a week.  According to Ms. Darden, at around three or four in the morning she was in

the bedroom, heard a "pop," and then smelled smoke.  Duncan got up to investigate and said it was

the police.  He then ran from the room.  Shortly thereafter, officers entered the bedroom and ordered

Ms. Darden to the ground.  Officers found Duncan in the bathroom, apparently trying to flush drugs

down the toilet because marijuana was found floating in the bowl.

Once the scene was secured, officers searched the premises.  In the bathroom, officers found

a tin container containing small bags of marijuana and crack cocaine on the right side of the toilet.

In the bedroom, officers found $902 in cash on the dresser next to the bed.  On a television stand in

the bedroom, officers also found unloaded pistol lying next to a holster and three loaded magazines.

In a kitchen cabinet officers found a container of Inositol powder and, in the basement, a shotgun.

Defendant argues that the amount of drugs recovered – 30.6 grams of marijuana, and 1.4

grams of cocaine – are "minuscule quantities," and consistent with personal use.  (Docket No. 1806

at 4).  He also argues that the pistol was not shown to have been in furtherance of a drug trafficking

crime.

It is true that a small quantity of drugs can give "rise to an inference that the drugs were

merely for personal use."  United States v. Warman, 578 F.3d 320, 334 (6th Cir. 2009).  But it is also

true that "[t]he government [is] not required to establish any specific quantity, or any intent to

distribute a specific quantity, in order to establish guilt of possession with intent to distribute,"

McPhearson v. United States, 675 F.3d 553, 561 (6th Cir. 2012), and possession of a small amount

of drugs can be offset by other factors suggesting an intent to distribute.  United States v. Nichols,

184 F. App'x 532, 535 (6th Cir. 2006); United States v. Harris, 192 F.3d 580, 589 (6th Cir. 1999).

Here, there are several factors from which the jury could conclude that the crack cocaine and

marijuana found in the search of Duncan's residence was possessed with the intent to distribute.  As

noted with respect to the conspiracy charge, recorded telephone conversations indicated that Duncan obtained cocaine with the intent to distribute the drugs, and also stored drugs for Vance on repeated occasions. Further, Ms. Darden testified that Duncan was not a drug user during the time that she knew him, and no drug paraphernalia (such as a crack pipe) was recovered from Duncan's residence. Additionally, the presence of a firearm and cash in Duncan's bedroom could properly be considered by the jury in determining whether he was a distributor rather than a user. See United States v. Coffee, 434 F.3d 887, 897 (6th Cir. 2006) (factors which a jury may consider in determining whether defendant intended to distribute drugs includes prior sales and the possession of a weapon in proximity to the drugs). There was sufficient evidence for the jury to find Duncan guilty on Count Sixteen, and the Court finds that the guilty verdict was not against the manifest weight of the evidence.

Turning to Count Seventeen, the Court has already identified several factors which may be considered in determining whether a firearm was possessed in furtherance of a drug trafficking crime. This "non-exclusive" list of factors, known as the "Mackey factors . . help to distinguish possession in furtherance of a crime from 'innocent possession of a wall-mounted antique or an unloaded hunting rifle locked in a cupboard.'" United States v. Brown, 732 F.3d 569, 576 (6th Cir. 2013) (quoting Mackey, 265 F.3d at 462). Several of those factors support the jury's guilty verdict on Count Seventeen.

The handgun "was 'strategically located so as to be quickly and easily available for use during [a drug] transaction.'" Id. (citation omitted). It was in Duncan's bedroom, next to a stack of cash and in a home where Duncan possessed both marijuana and crack cocaine. Further, although the gun was unloaded, it was out in the open, sitting next to several magazines of ammunition.

Additionally, the firearm was not a hunting rifle or antique pistol, but a Smith & Wesson .40 caliber pistol. Finally, Duncan's possession of the firearm was illegal because he had previously been convicted of a felony. From this evidence, the jury could conclude that Duncan possessed the firearm "to provide defense or deterrence in furtherance of drug trafficking," id. at 577, and the Court cannot say that such a conclusion would result in a miscarriage of justice.

### III. CONCLUSION

On the basis of the foregoing, the Court will enter an Order denying the motions for judgment of acquittal and/or for a new trial filed by Defendants Young, Parnell, and Duncan.

KEVIN H. SHARP
UNITED STATES DISTRICT JUDGE