# UNITED STATES DISTRICT COURT
## MIDDLE DISTRICT OF TENNESSEE
## NASHVILLE DIVISION

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | ) | |
| | ) | |
| v. | ) | No. 3:11-cr-00012 |
| | ) | |
| [14] DEMETRIUS DUNCAN | ) | |

## MEMORANDUM OPINION

Demetrius Duncan has filed a Supplemental Motion for Compassionate Release (Doc. No. 3041), to which the Government has responded in opposition (Doc. No. 3044), and Duncan has replied (Doc. No. 3057). After considerable thought, and for the reasons set forth below, Duncan's Motion will be granted.

## I. Background

Duncan was one of thirty-six individuals charged in a far-reaching Indictment[1] relating to the distribution of cocaine and crack cocaine in and around the Summit Heights public housing development in Clarksville, Tennessee between 2009 and 2013. More specifically, he was charged with conspiring to possess with intent to distribute 500 grams or more of cocaine and 280 grams or more of crack cocaine between January and December 2010 (Count One); possessing with intent to distribute cocaine on December 11, 2010 (Count Sixteen); possessing a firearm in furtherance of a drug trafficking crime between November 10, and December 11, 2010 (Count Seventeen); and possessing a firearm as a convicted felon during that same time period (Count Eighteen).

Only Duncan and two other Defendants – Chris Young and Alto Parnell – exercised their

---

[1] The original six-count Indictment against 28 Defendants was returned on January 12, 2011. (Doc. No. 202). A twenty-count Superseding Indictment adding four new Defendants was filed on April 17, 2013. (Doc. No. 1409). Finally, four more Defendants were added as a result of the Second Superseding Indictment returned on April 25, 2014. (Doc. No. 2081).

constitutional right to trial by a jury. As a result of going to trial, each faced a mandatory life sentence because the Government had filed Informations under 18 U.S.C. § 851 alleging that each Defendant had two or more prior felony drug convictions. (Doc. Nos. 1112, 1135, 1164).[2] After a twelve day trial, all three were found guilty of conspiring to distribute cocaine and crack cocaine as alleged in Count One, along with other crimes. All three were sentenced by then-Judge Kevin H. Sharp to life imprisonment on Count One because of the statutory enhancements. In addition to life imprisonment, Duncan was sentenced to concurrent sentences of 360 months on Count Sixteen, 180 months on Count Eighteen, and a mandatory consecutive sentence of 60 months on Count Seventeen.[3]

Duncan was sentenced on April 27, 2015. However, he had already been in custody for almost 4½ years, having been arrested on December 11, 2010 and detained since then. Thus, he has served almost ten years in prison as a result of his participation in the drug conspiracy alleged in the Indictment.

At sentencing, Duncan requested – and Judge Sharp recommended in the Judgment – that Duncan serve his sentence at the Federal Medical Center in Lexington, Kentucky. (Doc. No. 2615, at 58; 64; Doc. No. 2582 at 2). Nevertheless, Duncan is presently serving his sentence at the United States Penitentiary in Terre Haute, Indiana.[4] A request for compassionate release was sent to the

---

[2] Informations for enhanced penalties pursuant to § 851 were also filed against ten other Defendants, but only Xavier Parnell (Alto's Younger brother) was subjected to an enhanced penalty of life imprisonment. He chose to plead guilty and, as part of the plea agreement, the Government agreed to reduce the number of his prior felony drug convictions from two to one, thereby reducing the statutory penalty from mandatory life to 20 years to life. (Doc. No. 1245).

[3] The jury acquitted Duncan on Count Four.

[4] The record reflects some confusion as to where Duncan is housed. The return address on his letter to the Court requesting relief indicates that he is housed at USP-Terre Haute (Doc. No. 3035), the

Warden of that facility on June 10, 2020.  (Doc. No. 3044).  To date, there has been no response.

## II.  **Statutory Framework**

"By statute, a federal court 'may not modify a term of imprisonment once it has been imposed.'" United States v. Alam, 960 F.3d 831, 832 (6th Cir. 2020) (quoting 18 U.S.C. § 3582(c)). "But that rule comes with a few exceptions, one of which permits compassionate release."  Id. "Before the First Step Act of 2018, such relief was available only on motion of the Director of the Bureau of Prisons, but the new statute allows a prisoner to seek relief on his own initiative." United States v. Loggins, No. 19-2689, 2020 WL 4375103, at *1 (8th Cir. July 31, 2020).

Section 3582(c), as amended by the First Step Act, provides, in relevant part:

> The court, upon motion of the Director of the Bureau of Prisons, or upon motion of the defendant after the defendant has fully exhausted all administrative rights to appeal a failure of the Bureau of Prisons to bring a motion on the defendant's behalf or the lapse of 30 days from the receipt of such a request by the warden of the defendant's facility, whichever is earlier, may reduce the term of imprisonment . . ., after considering the factors set forth in section 3553(a) to the extent that they are applicable, if it finds that . . . extraordinary and compelling reasons warrant such a reduction . . . and that such a reduction is consistent with applicable policy statements issued by the Sentencing Commission. . . .

18 U.S.C. § 3582(c)(1)(A)(I).  Section 3582(c) does not define "extraordinary and compelling reasons."  Instead, in describing the duties of the Sentencing Commission, Congress directed the

_____

Government has affirmatively indicated that is where he is incarcerated (Doc. No. 3044 at 2), and the Federal Inmate Locator shows that to be his location.  However, both the Supplemental Motion for Compassionate Release and Reply state that he is being held at the Federal Correctional Institute at Terre Haute (Doc. No. 3041 at 6; 3057 at 1).

The federal facility at Terre Haute is "broken down into three separate and distinct housing facilities: United States Penitentiary (USP), a high-security facility; the Federal Correctional Institution (FCI), a medium security facility; and the Federal Prison Camp (FPC), a minimum security facility." United States v. Richard, No. 17-30014, 2020 WL 4500670, at *2 (C.D. Ill. Aug. 5, 2020).  Based on the Federal Inmate Locator, it seems pretty clear that Duncan is in the penitentiary portion of the complex.  Regardless, this Court's conclusion would remain the same were he actually housed in the medium security facility.

3

Commission to "promulgat[e] general policy statements regarding the sentencing modification provisions in section 3582(c)(1)(A)" and "describe what should be considered extraordinary and compelling reasons for sentence reduction, including the criteria to be applied and a list of specific examples." 28 U.S.C.§ 994t.[5] The Commission did so in United States Sentencing Guidelines ("U.S.S.G.") § 1B1.13 and its application notes.

The application notes describe three categories where extraordinary and compelling circumstances may be found to exist: (1) the medical condition of the defendant; (2) his or her age; and (3) his or her family circumstances, only the first of which is at issue here. With regard to the medical condition of a defendant, the application notes provides that compassionate release can be appropriate where:

> (i) The defendant is suffering from a terminal illness (i.e., a serious and advanced illness with an end of life trajectory). A specific prognosis of life expectancy (i.e., a probability of death within a specific time period) is not required. Examples include metastatic solid-tumor cancer, amyotrophic lateral sclerosis (ALS), end-stage organ disease, and advanced dementia.

> (ii) The defendant is –

>> (I) suffering from a serious physical or medical condition,
>> (II) suffering from a serious functional or cognitive impairment, or
>> (III) experiencing deteriorating physical or mental health because of the aging process,

> that substantially diminishes the ability of the defendant to provide self-care within the environment of a correctional facility and from which he or she is not expected to recover.

U.S.S.G. § 1B1.13, comment n. 1(A)-(C).

Additionally, the application notes contains a catch-all provision. It provides:

---

[5]  In delegating the description to the Commission, Congress specifically provided that "[r]ehabilitation of the defendant alone shall not be considered an extraordinary and compelling reason." Id.

(D) Other Reasons. – As determined by the Director of the Bureau of Prisons, there exists in the defendant's case an extraordinary and compelling reason other than, or in combination with, the reasons described in subdivisions (A) through (C).

Id., comment note (D).

Notably, the catch-all provision is different from the three other specific provisions because it is prefaced with the phrase, "as determined by the Director of the Bureau of Prisons." This seems to be a redundancy, however, because at the time the application notes were drafted, only the Bureaus of Prison could determine whether compassionate release was appropriate and "a district court could grant relief under § 3582(c)(1)(A) only on a motion by the BOP." United States v. Chambliss, 948 F.3d 691, 693 n.1 (5th Cir. 2020). That changed with the enactment of the First Step Act, but the application notes have not been updated since then, if for no other reason than there has not been a quorum on the Sentencing Commission to conduct business. See United States v. Rodd, No. 19-3498, 2020 WL 4006427, at *5 & n.9 (8th Cir. July 16, 2020) (observing that the policy statement regarding § 1B1.13 and compassionate release "has not been amended since the passage of the First Step Act," and noting the lack of a quorum on the Sentencing Commission); United States v. Handerhan, 789 F. App'x 924, 925 (3d Cir. 2019) (noting that the "[t]he Sentencing Commission has not yet amended § 1B1.13 or its commentary to account for the First Step Act").

Because the policy statements relating to compassionate release and U.S.S.G. § 1B1.13 have not been updated, the majority of the courts to have addressed the issue have determined that a court reviewing a request for compassionate release under the First Step Act can look not only at the three specific categories listed in application notes 1(A)-(C), but may also consider the "other reasons" category as set forth in application note 1(D). Compare, United States v. Lisi, 440 F. Supp. 3d 246, 250 (S.D.N.Y. 2020) ("[T]he Court finds that the majority of district courts to consider the question

5

have found that the amendments made to 18 U.S.C. § 3582(c)(1)(A) grant this Court the same discretion as that previously give to the BOP Director, and therefore the Court may independently evaluate whether [defendant] has raised an extraordinary and compelling reason for compassionate release."); United States v. Ward, No. 3:99-CR-00064-HDM, 2020 WL 4452046, at *2 (D. Nev. Aug. 3, 2020) (collecting cases and agreeing "with the well-reasoned decisions that district courts may base a finding of extraordinary and compelling reasons on the catch-all provision"); United States v. Thornton, No. CR 2:18-167-1, 2020 WL 4368155, at *3 (W.D. Pa. July 29, 2020) ("Consistent with the majority of courts that have considered this issue, I have found that the "catch-all" provision under (D) permits courts to independently assess whether 'extraordinary and compelling reasons' exist[.]"); with United States v. Rivernider, No. 10 Cr. 222 (RNC), 2020 WL 597393, at *3 (D. Conn. Feb. 7, 2020) (identifying cases where courts have determined that the BOP remains the gatekeeper of the catch-all category); United States v. Lynn, 2019 WL 3805349, at *2–4 (S.D. Ala. Aug. 13, 2019) (holding that courts must follow the policy statement as it stands and that the Director of the BOP is the ultimate arbiter of what counts as "extraordinary and compelling" under the catchall provision).

In this district, Judge Eli Richardson has held that "where (as here) the Director of BOP has not determined that any such 'other' reasons exist in the defendant's case, compassionate release for that defendant cannot be predicated on 'other' extraordinary and compelling reasons under the catchall provision." But, in doing so, conceded that "[t]he question remains a debatable one." United States v. Kimbrell, No. 3:19-CR-00064, 2020 WL 3972746, at *3 (M.D. Tenn. July 14, 2020). Judge Aleta A. Trauger, on the other hand, has held that "dependence on the BOP to determine the existence of an extraordinary and compelling reason, like the requirement for a motion

6

by the BOP Director, is a relic of the prior procedure that is inconsistent with the amendments implemented by the First Step Act," and therefore "federal judges are no longer constrained by the BOP Director's determination of what constitutes extraordinary and compelling reasons for a sentence reduction. . . . Accordingly, the district courts themselves have the power to determine what constitute extraordinary and compelling reasons for compassionate release." United States v. Young, No. 2:00-CR-00002-1, 2020 WL 1047815, at *6 (M.D. Tenn. Mar. 4, 2020).

In addition to there being no changes to the application notes, other factors tip the scale in favor of the conclusion that a court can look at "other reasons" when considering "extraordinary and compelling" reasons under the First Step Act. With some inevitable overlap, those reasons include:

• The compassionate release provision of the First Step Act began as a stand-alone bill titled "Granting Release and Compassion Effectively Act of 2018," S. 2471, 115th Cong. (2018) 2471, which "explicitly sought to 'improve the compassionate release process of the Bureau of Prisons.'" The need for such an act was apparent because, traditionally, the Bureau of Prison was parsimonious in granting compassionate release petitions. Indeed, through 2013, only 24 persons (on average) were released per year, and that number only increased to 83 inmates in 2014 after complaints were made by to the Bureau of Prisons by the Inspector General's office. "Since Congress still amended the program following this increase, one can infer Congress thought eighty-three was still insufficient." Assuming "the BOP Director faithfully executes the narrowly drawn policy and program statements related to compassionate release, . . . the only way direct motions to district courts would increase the use of compassionate release is to allow district judges to consider the vast variety of circumstances that may constitute 'extraordinary and compelling.'" United States v. Brown, 411 F. Supp. 3d 446, 451 (S.D. Iowa 2019).

• The policy statements in § 1B1.3 "not only pre-date the FSA amendment of § 3582(c) but also continue to reference expressly BOP's pre-FSA role as exclusive gatekeeper, which of course the FSA eliminated." United States v. Haynes, No. 93 CR 1043 (RJD), 2020 WL 1941478, at *11 (E.D.N.Y. Apr. 22, 2020).

• "Before the First Step Act's amendments to § 3582, it made sense that the BOP would have to determine any extraordinary and compelling reasons—only the BOP could bring a motion for a reduction of sentence under § 3582(c)(1)(A). But defendants no longer need the blessing of the BOP to bring such motions. The BOP in fact may never weigh in or provide guidance when a § 3582(c) motion is brought

7

by a defendant. Given the changes to the statute, the policy-statement provision that was previously applicable to 18 U.S.C. § 3582(c)(1)(A) no longer fits with the statute and thus does not comply with the congressional mandate that the policy statement must provide guidance on the appropriate use of sentence-modification provisions under § 3582." United States v. Cantu, 423 F. Supp. 3d 345, 351 (S.D. Tex. 2019) (internal citation omitted).

• "The Department of Justice issued internal guidance on May 18, 2020 directing the United States to concede extraordinary and compelling reasons exist when defendants present certain health conditions, including those in the Centers for Disease Control and Prevention's high-risk groups," even though "many conditions the United States conceded constitute extraordinary and compelling reasons are not health conditions 'from which [the incarcerated person] is not expected to recover,' as required in Note 1(A). Instead, these concessions fall more naturally into the catchall provision." United States v. Adeyemi, No. CR 06-124, 2020 WL 3642478, at *10 (E.D. Pa. July 6, 2020) (citation omitted).

• "'[Guideline] commentary has no independent legal force,'"and "'commentary that contradicts or is inconsistent with a federal statute is not authoritative,'" including "commentary to policy statements issued by the Sentencing Commission." The policy statement gives considerable discretion to the director of the BOP, but that discretion "is no longer appropriate, given Congress's decision to remove the Director's control over compassionate release motions." United States v. Avery, No. 2:07-CR-20040-2, 2020 WL 3167579, at *5–6 (W.D. Tenn. June 9, 2020) (quoting United States v. Havis, 927 F.3d 382, 386 (6th Cir. 2019); United States v. Murphy, No. 19-3290, 2020 WL 2910098, at *4 (6th Cir. June 3, 2020)).

Regardless of whether a Court should consider "other reasons" beyond the three specifically enumerated categories in the application notes to the Guidelines, compassionate release for extraordinary and compelling reasons is only permissible if the defendant "is not a danger to the safety of any other person or the community, as provided in 18 U.S.C. § 3142(g)." U.S.S.G. § 1B1.13(2). The Court must also consider the 18 U.S.C. § 3553(a) factors, insofar as they are applicable.

## II. Application of the Statutory Framework

Duncan seeks compassionate release because of his poor health and the likelihood that were

he to become infected with COVID-19 he would become extremely sick or die. To its credit, the Government "agrees that Duncan's documented chronic health conditions place him at an increased risk of becoming seriously ill if he were to contract COVID-19." (Doc. No. 3044 at 10). Also to its credit, the Government concedes that his "chronic medical conditions combined with the risk of COVID-19, constitute an 'extraordinary and compelling' reason." (Id. at 11). Nevertheless, the Government argues that Duncan's request for compassionate release should be denied because he "has failed to show that he no longer poses a danger to the safety of the community and otherwise merits release under the § 3553(a) factors." (Id.).

## A. "Extraordinary and Compelling" Reasons

This far into the global pandemic, COVID-19 needs no introduction and merits little discussion given the havoc it has wreaked. The constant and daily reminders of its existence, its still unknown long term impact on the body, and the need to be ever-vigilant should be enough.

According to the World Health Organization, COVID-19 has led to more than 727,000 deaths worldwide and more than 160,000 deaths in the United States as of August 10, 2020. See, https://covid19.who.int (all websites last visited 8/10/2020). It has also led to a countless number of people becoming sick (some seriously); radically altered the daily routine for most; decimated economies; and changed the lives of all.

As it pertains to the issue now before the Court, two points merit discussion. First, COVID-19 is a particularly virulent form of the coronavirus that is easily transmitted from person-to-person. Even those who are asymptomatic can spread the disease. For this reason, the Centers for Disease Control ("CDC") has established guidelines and recommendations to control its spread. This includes washing hands often; avoiding touching one's eye, nose, and mouth with unwashed hands;

avoiding close contact with people who may be sick; social distancing (at least 6 feet) when not at home; cleaning and thoroughly disinfecting frequently touched surfaces; and monitoring one's health daily. See, www.cdc.gov/coronavirus/2019-ncov/prevent-getting-sick.

Notwithstanding the Bureau of Prison's notable efforts,[6] implementing the CDC's recommendations is easier said than done in a prison environment. Quoting an opinion from Dr. Joseph J. Amon, an infectious disease epidemiologist who has studied infectious diseases in detention settings and is the Director of Global Health at Drexel University's Dornsife School of Public Health, one court observed:

> Detention facilities have even greater risk of infectious spread because of conditions of crowding, the proportion of vulnerable people detained, and often scant medical care. People live in close quarters and are also subject to security measures which prohibit successful "social distancing" that is needed to effectively prevent the spread of COVID-19. Toilets, sinks, and showers are shared, without disinfection between use. Food preparation and food service is communal, with little opportunity for surface disinfection. The crowded conditions, in both sleeping areas and social areas, and the shared objects (bathrooms, sinks, etc.) will facilitate transmission.

United States v. Rodriguez, No. 2:03-CR-00271-AB-1, 2020 WL 1627331, at *8 (E.D. Pa. Apr. 1, 2020); see also, United States v. Rae, No. CR 15-432, 2020 WL 4544387, at *3 (E.D. Pa. Aug. 6, 2020) (noting that "to the extent correctional facilities may have successfully dealt with past viruses and outbreaks of communicable diseases, those diseases pale in scope with the apparent magnitude and speed of transmission of COVID-19 and the challenges associated with it"); United States v. Hansen, No. 17 CR 50062, 2020 WL 2219068, at *2 (N.D. Ill. May 7, 2020) (observing that "if and when [COVID-19 enters an institution], it is likely to spread more quickly than in the general population due to, among other things, the difficulty of accomplishing social distancing in a prison

---

[6] The Bureau of Prison's effort to control and limit the spread of the virus in its institutions is discussed in the Government's Response. (Doc. No. 3044 at 3-6).

10

environment and the constant influx of people coming and going from outside the prison, including correctional staff.").

As for USP-Terre Haute, the Government states that, as of the date of its filing (June 22, 2020), three inmates had tested positive, and one had died. (Doc. No. 3044 at 3). Duncan places the figure at four inmates testing positive, with one death as of July 7, 2020. (Doc. No. 3057 at 1). According to the Bureau of Prisons' website, USP-Terre Haute has had eight inmates who tested positive, and one inmate who has died as of August 10, 2020. https://www.bop.gov/coronavirus/. Vigo County, Indiana, where USP-Terre Haute is located, had 651 confirmed cases of coronavirus and 10 deaths, as of August 10, 2020. https://www.coronavirus.in.gov/.

From a mere numbers standpoint, it appears that USP-Terre Haute has been extremely fortunate to have such a low infection rate. Perhaps that is because of the efforts the BOP has put in place, or maybe it is because less than one quarter of the inmate population (322 of USP-Terre Haute's 1,298 inmates) had completed tests as of August 7, 2020. https://www.bop.gov/coronavirus/. Regardless, it can hardly be assumed that there will be no further cases of coronavirus at the USP in Terre Haute.

Nationwide, "the rate of COVID-19 infections per 1,000 people in the United States is currently 13.55, in BOP facilities that rate is at least 74.13." United States v. Tidwell, No. CR 94-353, 2020 WL 4504448, at *6 (E.D. Pa. Aug. 5, 2020). Further, some Bureaus of Prison facilities have recently experienced large COVID-19 outbreaks. "For example, as of August 4, 2020, 666 inmates, or 61 percent of inmates, have tested positive for COVID-19 at Butner Low FCI, and 16 of those have died. At Elkton FCI, 1,010 inmates (46 percent of inmates) have tested positive, and 9 of those have died. At Seagoville FCI, 1,321 inmates (75 percent of inmates) have tested positive,

and 3 of those have died." United States v. Clark, No. CR11-3034-LTS, 2020 WL 4507325, at *4 (N.D. Iowa Aug. 5, 2020).  This does not bode well for any of the staff or the inmates, and it is particularly bad for some.

This leads to the second point.  There are certain individuals who stand a much better chance than others of becoming extremely sick or even dying if they contract the present strain (SARS-CoV-2) of the coronavirus.  The CDC has recognized as much by identifying a number of high risk categories, including older adults, and those with certain underlying medical conditions.  Individuals who have cancer, chronic kidney disease, chronic obstructive pulmonary disease (COPD), an immunocompromised state (weakened immune system) from a solid organ transplant, serious heart conditions, sickle cell disease, and type II diabetes mellitus are at increased risk of severe illness or death from COVID-19. www.cdc.gov/coronavirus/2019-ncov/need-extra-precautions/. Individuals with moderate to severe asthma, cerebrovascular disease, cystic fibrosis, hypertension (high blood pressure), an immuncompromised state due to certain procedures or diseases, certain neurological conditions, liver disease, pulmonary fibrosis, and type I diabetes mellitus might have an increased risk of severe illness or death. Id.. The CDC recognizes, however, that "COVID-19 is a new disease," and that "there are limited data and information about the impact of underlying medical conditions and whether they increase the risk for severe illness from COVID-19."  Id.

The research and study is ongoing, but Duncan's myriad of health problems dating back to birth place him squarely in the high risk category.  He was born prematurely (33 weeks gestation), weighing 3 pounds 14 ounces.  He suffered a hemorrhage at birth that resulted in fluid on the brain (hydrocephalus).  Duncan's brain hemorrhage is believed to have caused memory impairment, dizziness, and limitations in his intellectual ability.  (Presentence Report as revised 4/16/2015

12

("PSR") at 22). Indeed, a standardized test in the eighth grade revealed that he was below the fifth percentile in reading, language, math, and spelling, all of which necessitated special education classes. One doctor, who saw him in late 2017, described Duncan as having a "limited vocabulary," and "appear[ing] to be mildly retarded." (Doc. No. 3045-1 at 738).

As a result of the brain hemorrhage, a ventriculoperitoneal shunt was inserted when Duncan was ten weeks old. The shunt has not proven trouble-free. According to the medical records: when Duncan was five years old he had a shunt replacement or revision at Vanderbilt Medical Center; again when he was nine; another revision when he was 17; and yet another at some time in 2016. (Id. 496, 738). In early May 2018, he was taken to the neurosurgery department at Indiana University Medical Center for adjustment of the shunt. (Doc. No. 3045-1 at 109). Shortly thereafter he was admitted to the hospital to address nausea and vomiting that apparently was the result of too much drainage into the abdomen from the shunt. (Id. at 111-112). This was hardly a mild inconvenience. Duncan underwent surgery to replace the shunt valve, and he was thereafter monitored on an inpatient basis at the hospital for hydrocephalus. (Id.. at 658, 675). One record pointedly indicates that Duncan "has been to the Emergency Room and Union Hospital and Indiana University throughout the whole month of May." (Id. at 398).

At the time the PSR was written, Duncan was described as having a "complex medical history," due in part to the insertion of the shunt and associated problems, as well as the fact that he has diabetes. (PSR, App'x. A at 2). That remains true today as evidenced by the 1,075 pages of medical records[7] that have been presented (Doc. Nos. 3045-1, 2, 3) and reviewed by the Court. Only a few highlights are necessary to show why Duncan is at high risk of severe illness or death if he

---

[7] The record contains a large number of duplicates.

were catch the present strain of the coronavirus.

Duncan is an insulin-dependent diabetic.[8] His hemoglobin A1C test, which tests blood sugar level for the past two to three months, is consistently well-above the accepted level of 7% for persons with diabetes. www.mayoclinic.org/tests-procedures/a1c . For example, Duncan's A1C level on May 11, 2018 was 11; on October 15, 2018 it was "over 11"; on May 16, 2019 it was 11.2; on October 15, 2019 it was 10.5; and on January 16, 2020 it was 9.6. (Doc. No. 3045-1 at 18;3045-2 at 194; 3045-3). His daily blood sugar readings are no better. "A blood sugar level less than 140 mg/dL (7.8 mmol/L) is normal. A reading of more than 200 mg/dL (11.1 mmol/L) after two hours indicates diabetes." www.mayoclinic.org/diseases-conditions/diabetes/diagnosis-treatment. On October 15, 2018, it was reported that Duncan's average blood sugar was between 150 and 180 in the morning, but that it was over 300 in the evenings. (Doc. No. 3045-1 at 18). On May 18, 2018, his glucose level was 204, six days later it was 245, and a month after that it was 259. (Id. at 333, 383, 391). On the morning of November 18, 2018, Duncan had a blood sugar level of 280, and the night before it was "over 200." (Id. at 8). A report dated December 7, 2018 indicates "poor control BS 400's." (Id. at 1). On April 7, 2020, Duncan had a non-fasting glucose level of 387. (Doc. No. 3045-3 at 10). Clearly Duncan's diabetes is not under control.

Diabetes can lead to a host of other medical conditions or complications, including cardiovascular disease, nerve damage, kidney damage, or eye damage. Id. As a result of his uncontrolled diabetes, Duncan has diabetic macular edema and proliferative diabetic retinopathy.

---

[8] The medical records at times indicate that he has Type II diabetes. (See e.g., 3045-1 at 9, 67, 179, 190, 509; 3045-2 at 16). At other points it states that he has Type I diabetes. (See e.g., Doc. No. 3045-1 at 705; 3045-2 at 216). To further compound matters, a physician who has reviewed the records stated that Duncan has "type I insulin dependent diabetes mellitus[.]" (Doc. No. 3060-1 at 1). Either way, there is no dispute that he has uncontrolled diabetes.

14

(Doc. No. 3045-2 at 208). The latter is "the most common diabetic eye disease and the leading cause of irreversible blindness in working age Americans." www.nei.nih.gov/learn-about-eye-health/eye. Because of that, Duncan was warned about the "risk of permanent blindness if not compliant with diabetic treatment[.]" (Id.). He was also warned about the possibility of retinal detachment as result of his vitreous opacities, which are floaters in the eyes that can be the result of diabetes. www.aoa.org/patients-and-public/eye-and-vision-problems.

The medical records also indicate polyneuropathy as a result of his diabetes. (Doc. No. 3045-1 at 190, 218, 220). This likely explains the large scars on his legs that were burned as a result of his being unable to feel the heat from a dirt bike when it touched his legs. (PSR, App'x. A at 2).

Whether the result of his uncontrolled diabetes or not, Duncan's medical records also show that he also has chronic kidney disease, mild hepatic steatosis (fatty liver), high blood pressure (hypertension), high cholesterol (hyperlipidemia), and asthma with chronic intermittent bronchitis, for which he has been prescribed an inhaler. (Doc. No. 3045-1 at 190, 209, 474; 3045-2 at 16, 18, 216; 3045-3 at 13, 103; 3060-1 at1). He also suffers from chronic headaches. (Doc. No. 3045-1 at 60).

Based upon the CDC's guidelines, Duncan undoubtedly is at an increased risk of severe illness or death were he to contract COVID-19 because of his diabetes and his hypertension alone. His kidney issues, asthma, and repeated problems with his shunt do no make the risk any less.

Obviously, the undersigned is not a physician, let alone an epidemiologist or an infectious disease expert. Nevertheless, this Court's concern about the likelihood of severe illness or death should Duncan contract COVID-19 is shared by Dr. Paul Byrant, an infectious disease physician with the Frist Clinic at Centennial Medical Center in Nashville, Tennessee.

15

Reviewing the medical records, Dr. Bryant "identified several factors that put Mr. Duncan at risk for severe COVID-19 including uncontrolled diabetes, stage 2 chronic kidney disease (based on laboratory data indicating mild-moderate renal impairment), and asthma." (Doc. No. 3060-1 at 1). He also opines that "for certain chronic conditions," including cardiovascular disease, diabetes, and hypertension, the risk "tends to increase with poorer diabetic control." (Id. at 2). What this means for Duncan is that were he "to require mechanical ventilation and prolonged ICU level care as a result of COVID-19, this would increase the likelihood of developing a secondary hospital acquired bacterial infection independent of his initial viral infection" that, in turn, "would likely complicate weaning [him] off ventilatory support, further prolonging his hospitalization and increasing his risk of significant morbidity." (Id,). Taking everything into account, Dr. Bryant states: "it is my professional opinion that Mr. Duncan falls into the **HIGH RISK** category for developing severe disease were he to be infected," which "could lead to prolong hospitalization in intensive care, extended mechanical ventilatory support, long-term rehabilitation requirements, significant medical costs, and possibly death." (Id.) (emphasis in original).[9]

Given all of the foregoing, the Court agrees with both Duncan and the Government: Duncan's medical condition coupled with the continuing COVID-19 pandemic present "extraordinary and compelling reasons" under the First Step Act. This conclusion remains even if the Court cannot make an independent judgment by considering "other factors" under application note 1(D). As the Court recently explained:

A condition from which he is not expected to recover means a chronic condition.

---

[9] The Court fully recognizes that the medical records report that Duncan has at times been uncooperative, non-compliant with some instructions, refused medicine, and often expressed the desire to be sent to a federal medical center. None of this, however, detracts from him being in the high risk category should he contract COVID-19.

United States v. DeMille, ___ F. Supp. 3d ___, 2020 WL 2992190, at *2, *4 (D. Or. June 4, 2020) ("a chronic medical condition (i.e., one from which a defendant is not expected to recover) reasonably may be found to be both serious and capable of substantially diminishing the ability of the defendant to provide self-care within the environment of a correctional facility"); see also United States v. Readus, No. 16-20827-1, 2020 WL 2572280, at *2 (E.D. Mich. May 21, 2020) (identifying high blood pressure as a chronic disease which does not offer an expectation of recovery). The "serious" condition need not be terminal. A terminal illness is separately delineated in the policy statements, U.S.S.G. § 1B1.13 n.1 (A)(i), and "terminal illness" is specifically omitted from the Sentencing Commission's definition of a "serious physical or medical condition" so, impliedly, a "serious" condition does not need to be a terminal condition. Id. § 1B1.13 n.1(A)(ii). As reflected in the decisions of many courts since this pandemic began, a serious physical or medical condition that inhibits self-care in prison is one not adequately managed in prison that places the inmate at a serious elevated risk of infection and death from COVID-19 from which he cannot protect against while in custody. See DeMille, 2020 WL 2992190, at *2; United States v. Arreola-Bretado, ___ F. Supp. 3d ___, 2020 WL 2535049, at *4 (S.D. Cal. May 15, 2020) ("Designating the particular medical threat posed by COVID-19 and [pre-existing] conditions as extraordinary and compelling is consistent with a policy in favor of releasing inmates with serious medical conditions."); United States v. Jepsen, ___ F. Supp. 3d ___, 2020 WL 1640232, at *4–5 (D. Conn. Apr. 1, 2020) ("An inmate's [mere] diagnosis of a chronic condition does not constitute an 'extraordinary and compelling' basis" but may if the inmate suffers "chronic conditions that are in flux and predispose him to potentially lethal complications if he contracts COVID-19").

United States v. White, No. 3:17-CR-00098, 2020 WL 4530931, at *2 (M.D. Tenn. Aug. 6, 2020).

## B. Applicable Section 3553(a) Factors and Danger to the Community

This is a rare case under the First Step Act. The 3553(a) factors as they relate to Duncan were not considered by the sentencing judge because the § 851 enhancement mandated a life sentence. There was no "individualized assessment based on the facts presented." Gall v. United States, 552 U.S. 38, 50 (2007). The requirement that a life sentence be imposed became the first and last chapter of Duncan's sentencing hearing. The First Step Act in conjunction with Duncan's serious health issues and COVID-19 allow this epilogue to be written.

### (1) The nature and circumstances of the offense and the history and characteristics of the defendant

Duncan is 39 years old and has seven siblings, two of whom have died. He is unmarried, but the father of six children. (PSR at 21). His mother died in 2003 as a result of bone cancer when Duncan was 22. (Id.). Were he to be released, his sister, Janice Briggs, has offered to take him into her home in Clarksville, Tennessee, and pay for private health insurance.

When Duncan dropped out of school in the eleventh grade, he was performing dismally, and had a grade point average of 66.5. (Id.). As noted previously, he scored extremely low on IQ tests, and required special education classes.

Duncan's physical and medical conditions have already been described in detail. In addition, he has been prone to depression and anxiety over the years, for which he has not sought treatment. (Id. at 22). His substance abuse, which started at an early age, has been limited to alcohol and marijuana, but he tried cocaine on one occasion. (Id. at 23).

As a result of his medical conditions, Duncan began receiving social security disability benefits at the age of 17. Otherwise, he has an extremely limited employment record consisting of working "on and off" as a landscaper from 2007 until 2009, and working for two months in 2003 at the Electrolux factory in Springfield, Tennessee.

According to a Memorandum from Probation and Pretrial Services dated June 17, 2020, Duncan has participated in a number of classes since his incarceration, including programming for leadership in 2020, recreational aid instruction and money smart in 2019, a sketch class in 2017, drug education in 2016, and color theory and crochet in 2019. Duncan also worked in the recreation center in 2019, and is awaiting a food services work assignment. He has received two disciplinary infraction, one in January 2019 for failing to stand count, and one for phone abuse in 2016. A Tennessee warrant for a 2010 probation violation was dismissed in 2015.

The offenses for which Duncan stands convicted, as discussed above and below, are serious. In addition to the overarching drug conspiracy conviction that is troubling enough, he was convicted of possessing with intent to distribute cocaine and marijuana, with possessing a firearm in furtherance of a drug trafficking crime, and with being a felon in possession of a firearm. While he didn't use any guns or injure anyone, the combination of drugs and guns is a recipe for disaster.

### 2. *The need for the sentence imposed*

This factor is  intended to "to reflect the seriousness of the offense, to promote respect for the law, and to provide just punishment for the offense; (B) to afford adequate deterrence to criminal conduct; (C) to protect the public from further crimes of the defendant; and (D) to provide the defendant with needed educational or vocational training, medical care, or other correctional treatment in the most effective manner."  18 U.S.C. § 3553(a)(2).  Duncan's counts of conviction unquestionably called for a substantial sentence.  In no way, however, did they call for a life sentence, a point Judge Sharp made clear at sentencing.

Judge Sharp chose not "to go through the 3553 factors because of the mandatory sentence on Count One," but he also stated that a sentence of "probably 240 months and 10 years of supervised release would be sufficient but not more harsh than necessary in this case[.]" (Doc. No. 2615 at 64).  Even the Government acknowledged that "reasonable minds c[ould] differ on the appropriate sentence," but pointed out that the only available sentence was life imprisonment.  (Doc. No. 2532 at 5).

Moreover, as it pertains to the protection of society and the need to deter, it is notable that, while Duncan was subjected to the career offender and armed career criminal enhancements because of the nature of his prior convictions, his criminal history record is not extensive when viewed in

19

isolation or when comparted to many others who have appeared in this Court. Prior to the instant changes, he only served 24 days in custody. He received 1 point for firing a gun in a parking lot when he was twenty; another point for aggravated assault, also when he was twenty; 2 points for the sale of controlled substances when he was twenty-three; and 1 point for possessing with intent to sell cocaine when he was twenty-five. This totals 5 criminal history points to which 2 points were added because the present offense was committed while he was on probation for his cocaine possession charge. Even so, Duncan had 7 criminal history points which would have placed him at the low-end of Category IV. Instead, he was placed in Category VI.

### 3. The kinds of sentences available and the guideline range

This factor weighs heavy in the Court's analysis. Again, Duncan faced a life sentence. There was simply no choice in the matter given the 851 enhancement. According to the calculations prepared by Probation and Pretrial Services in response to Duncan's request for compassionate release, however, were he to benefit from the Fair Sentencing Act and be sentenced today, Duncan would face a statutory penalty of 10 years to life on Count One; not more than 20 years on Count 16; 5 years to life consecutive on Count 17; and 15 years to life on Count 18. With the career offender enhancements, his Guideline range would be 360 months to life on Counts 1, 16, and 18. In short, a mandatory life sentence would be off the table.

### 4. The need to avoid unwarranted sentence disparities among defendants with similar records who have been found guilty of similar conduct

This factor also weighs heavily in the Court's analysis. As noted at the outset, only three Defendants went to trial, and only those three received a life sentence. This is not to say that they

were the most blameworthy.  Far from it.

At Duncan's sentencing, Judge Sharp observed, "[t]he three least culpable guys that I've seen come through are getting the harshest penalties, and I don't know how to fix that."  (Doc. No. 2615 at 11).  When he sentenced co-Defendant Chris Young (also a career offender), Judge Sharp stated that a life sentence was "way out of whack with the punishment of the others."  (Doc. No. 2325 at 46).  In that same sentencing, Judge Sharp lamented that the 3553(a) factors that require a court to "fashion a sentence that's sufficient but not more harsh than necessary" was "out the window here," and that a life sentence was "more harsh than necessary."  (Id. 11). Finally, he observed that he "wish[ed] it was not that way," but hoped that "somebody can fix this."  (Id. at 11, 46).

"[Robert] Porter was unquestionably the kingpin of th[e] enterprise, [but] others played significant roles, including [Brian] Vance, who was shown to work under Porter."  United States v. Duncan, No. 3:11-00012, 2014 WL 655410, at *9 (M.D. Tenn. Feb. 20, 2014).  Porter, who pled guilty to the conspiracy charge in Count One, and to possessing with intent to distribute cocaine, which required a minimum 10 year sentence (Count Three), was sentenced to 300 months.  (Doc. No. 1956 at 2).   Vance, who pled guilty to the conspiracy charge in Count One, and to possessing with intent to distribute cocaine (Count Two), and to being an accessary after the fact to a Hobbs Act robbery resulting in death (Count Eight), and to conspiring to commit Hobbs Act robbery (Count Nine), was sentenced to 200 months. (Doc. No. 1944 at 2).  Even though Duncan may not have been a bit player given the evidence presented to the jury, he was certainly a lot farther down the food chain, yet received a life sentence.  See, United States v. Young, 847 F.3d 328, 341 (6th Cir. 2017) (describing the conspiracy and noting that Porter was "the leader of the organization" who "distributed large quantities of cocaine to Vance," who, in turn distributed cocaine to Duncan

and others for resale on the streets).

Most of the 33 defendants pled guilty only to Count One of the Indictment, and their sentences ranged from 36 months (Travis Hodges), to 300 months (Xavier Parnell). (PSR at 2). Many received sentences on Count One of less than, or within a few years of the tens years that Duncan has almost served: Shatika Dix (42 months); Joshua Dix (120 months); Gregory Brooks (156 months); Doenis Jelks (150 months); Quinice Cross (132 months); Kronski Howard (130 months); and Anthony Shelton (151 months).

Clearly there were reasons for the variations in the sentences imposed "[b]ecause a defendant's sentence reflects the sentencing judge's view of the § 3553(a) factors at the time of sentencing." United States v. Pawlowski, No. 20-2033, 2020 WL 4281503, at *2 (3d Cir. June 26, 2020). That view, of course, was never implemented with regard to Duncan and the two co-defendants who went to trial. What was expressed was that Duncan's sentence was too high, if not draconian. Having studied the record, the Court agrees.

### 5. *Danger to others or the community*

In addition to the Section 3553(a) factors, a court considering a request for compassionate release must consider whether the defendant poses a danger to other persons or the community under 18 U.S.C. § 3142(g). Thus, "even where an individual has medical conditions which make him vulnerable to COVID-19, the individual's danger to the community may ultimately outweigh any health concerns and the balance of factors would weigh against release." United States v. Belle, No. 3:18-CR-117-(VAB)-1, 2020 WL 2129412, at *5 (D. Conn. May 5, 2020).

The Government argues that the nature of Duncan's convictions and his prior record make him a danger to society. It acknowledges Duncan's argument that the present definition of "serious

22

drug felony" would likely negate two of his three prior drug convictions as predicates for an enhanced sentence, but argues that his record otherwise shows a "propensity toward violence" and a "history of firearms use." (Doc. No. 3044 at 12).

As already noted, Duncan's criminal history category VI overstates his actual criminal record. "Although he certainly is not the most benign of offenders considered by the Court, neither is he among the most nefarious." United States v. Poole, No. 2:02-CR-20026, 2020 WL 4192280, at *7 (W.D. Tenn. July 14, 2020). Further, his convictions for reckless endangerment and aggravated assault happened almost twenty years ago, and he has had almost a decade in prison to reflect on his conduct. During that period, he has had only two minor infractions, neither involving violence. Moreover, Duncan will be on supervised release for the ten year period imposed by Judge Sharp (Doc. No. 2587 at 3), and will be subject to a period of home confinement that hopefully will temper his conduct. Finally, the high risk of debilitating illness or death in the COVID-19 environment should "tend to cool Defendant's enthusiasm for being out and about committing crimes[.]" United States v. Medlin, No. 3:09-CR-00204, 2020 WL 4274199, at *5 (M.D. Tenn. July 24, 2020).

### 6. Denouement of the relevant factors

"Congress has instructed sentencing courts to impose sentences that are 'sufficient, *but not greater than necessary*, to comply with' (among other things) certain basic objectives, including the need for 'just punishment, deterrence, protection of the public, and rehabilitation.'" Holguin-Hernandez v. United States, 140 S. Ct. 762, 765–66 (2020) (emphasis in original). District courts have "broad discretion to determine what sentence will serve [§ 3553(a)'s] statutory objectives." United States v. Kontrol, 554 F.3d 1089, 1093 (6th Cir. 2009). In exercising that

discretion, "courts routinely weigh whether a certain amount of time is 'sufficient, but not greater than necessary,' to serve § 3553(a)'s purposes," and "may use that same calculus when deciding whether to grant a motion for compassionate release." <u>United States v. Kincaid</u>, 805 F. App'x 394, 395–96 (6th Cir. 2020). Since his sentencing, Duncan's health condition has significantly deteriorated, he has taken advantage of correctional programs (including drug education), shown compliance with institutional rules and the law has a more lenient view of his past criminal conduct. But what has not changed since his sentencing is that Duncan grew up without any male role models, in lower economic conditions, a compromised mental and emotional health that when combined with the changes in his life make the likelihood that he will engage in new criminal behavior very low. Given the limitations of being an inmate and his deteriorating health, Duncan has done all that he could do to show that he is no longer a danger to the public. The almost ten years that Duncan has served is sufficient punishment, particularly considering the likelihood of severe medical complications or death should he contract COVID-19.

## IV.  <u>Conclusion</u>

On the basis of the foregoing, Duncan's Supplemental Motion for Compassionate Release (Doc. No. 3041) will be granted and his sentence will be reduced from life imprisonment to time served. He will serve ten years on supervised release and, as a part of that, will serve a period of home confinement.

An appropriate Order will enter.

_____
WAVERLY D. CRENSHAW, JR.
CHIEF UNITED STATES DISTRICT JUDGE

Case 3:11-cr-00012   Document 3076   Filed 08/12/20   Page 25 of 25 PageID #: 17527